**ATLANTA JOURNAL AND CONSTITUTION, et al., Plaintiffs,**

v.

**The CITY OF ATLANTA DEPARTMENT OF AVIATION, et al., Defendants.**

Nos. 1:96–CV–1738–RWS, 1:96–CV–1847–RWS.

United States District Court, N.D. Georgia, Atlanta Division.

July 24, 2000.

---

Peter Crane Canfield, Sean R. Smith, Thomas MacIver Clyde, Dow, Lohnes & Albertson, Atlanta, GA, James Clifton Rawls, Powell, Goldstein, Frazer & Murphy, Atlanta, GA, for plaintiffs.

James Clifton Rawls, Pilar Gretchen Keagy, Powell, Goldstein, Frazer & Murphy, Atlanta, GA, Alice Neff Lucan, phv, Washington, DC, Peter Crane Canfield, Sean R. Smith, Thomas MacIver Clyde, Dow, Lohnes & Albertson, Atlanta, GA, for plaintiffs.

William Henry Boice, Michael W. Tyler, R. Scott Tewes, Kilpatrick Stockton, Atlanta, GA, Michael Lloyd Smith, Evelyn Yvette Teague, Office of Atlanta City Attorney Law Department, Atlanta, GA, for defendants.

## ORDER

STORY, District Judge.

Plaintiffs Atlanta–Journal and Constitution ("AJC"), USA Today, and intervenor-plaintiff the New York Times allege defendants City of Atlanta Department of Aviation and various city officials deprived the newspapers of constitutional rights guaranteed by the First Amendment. Now the Court considers AJC's Motion for Summary Judgment [113–1], USA Today's Motion for Summary Judgment [115–1], and Defendant's Motion for Summary Judgment [114–1]. After reviewing the record, and hearing oral argument on June 27, 2000, the Court enters the following Order.

### Background

The City of Atlanta and major newspaper publishers have spent over four years in this Court exploring their fundamental differences of opinion over to what extent each may control newsracks at Hartsfield Atlanta International Airport. A preliminary injunction has been in place throughout this time. Vast amounts of time, energy, and money have been poured into this dispute which, at times, has appeared to be on the verge of resolution, and at others, promises to extend ad infinitum. After both sides moved for summary judgment, settlement appeared imminent so the Court denied the motions with the right to refile. When, after an extended time, the elusive settlement did not materialize the AJC, USA Today, and the Defendants reinstated their motions.

Although the factual background of this case is set out in this Court's Order of June 3, 1998, *Atlanta Journal and Constitution v. City of Atlanta Department of Aviation*, 6 F.Supp.2d 1359 (N.D.Ga.1998), some facts bear repeating. Plaintiff newspaper publishers challenge the City's 1996 plan[1] governing the use of newsracks at Hartsfield Atlanta International Airport. Nearly 64 million passengers traveled through the airport in 1996. Some 15 million people visit the airport annually when accompanying departing passengers or greeting those who arrive. An additional 35,000 to 45,000 people work there.

The airport consists of a main passenger terminal and six concourses accommodating arriving and departing flights. Establishments and vending machines offering a variety of goods and services are located in the terminal and along the concourses.

Historically, airport management contracted out concessions at the airport and had no direct control over concessions. Under this arrangement, the AJC sold its papers through a contract with Airport News which had been granted the exclusive right to provide all concessions at the airport. The AJC had eighteen newsracks in the airport and paid a portion of the proceeds from the sale of papers to the concessionaire which, in turn, paid part of its revenues to the city.

In 1995 and 1996 the airport underwent a major renovation, and at that time AJC removed all but eight of its newsracks with the understanding the newsracks would be replaced upon completion of the construction. Along with the renovation, the airport intensified its efforts to operate as more of a business entity. The city signed new concession contracts. Unlike the earlier contracts, the new contracts did not grant to the concessionaire the right to enter into subcontracts for the placement of newsracks. Instead, that responsibility fell to the Department.

As the 1996 Olympics approached, city officials developed a program along with Coca–Cola whereby the city would receive a subsidy for arts programs in exchange for allowing Coca–Cola to maintain a commercial display area in the airport's atrium and to occupy prime retail space in that area without going through the usual bid process. In looking for more ways to promote Coca–Cola and its downtown "Olympic City" commercial attraction, the city and Coca–Cola agreed newsracks in the airport would bear Coca–Cola advertising. Representatives of Coca–Cola selected twelve locations for the sixty-four newsracks.

In April 1996 the City of Atlanta Aviation Department ("Department") announced it was formulating a plan to replace privately-owned racks in the terminal with city-owned newsracks and that this new plan would go into effect on July 1, 1996. The City's 1996 plan featured four essential aspects. First, the City owned the newsracks. Second, the newsracks were part of an airport promotion in conjunction with the 1996 Olympic Games and Coca–Cola was to play a major role in the Olympic promotion. Accordingly, the newsracks were to display advertisements for Coca–Cola. In contrast, the plan limited the publishers' ability to place their own logos or advertisements on the newsracks.[2] Third, publishers selected to use the city-owned newsracks were

---

1. Only the 1996 plan warrants consideration. The Department proposed an alternative plan earlier in the litigation, but this Court ruled the proposed plan was not properly before the Court. *See Atlanta Journal and Constitution v. City of Atlanta Dept. of Aviation Dept.*, 6 F.Supp.2d. at 1364–65.

2. The Department allowed an "identifying strip" which was subject to Department approval.

required to pay $20 per month rental charge for using the newsrack. Finally, the Department's decision to grant a permit for a publisher to use a newsrack would be based on a "desire" to have diversity of viewpoints in the airport and the Department could cancel a permit on thirty days notice.

On July 5, 1996 the AJC installed it own newsracks in the atrium and vestibule areas of the airport terminal building. The Department confiscated the racks, citing the AJC's failure to secure a permit and claiming the side-by-side configuration of the racks might constitute a fire code violation.

On July 9, AJC filed this action and moved for a temporary restraining order and a preliminary injunction. Following a hearing the next day the Court entered an order enjoining the city from enforcing its newsrack leasing program.

On July 11, 1996 the AJC placed newsracks at the airport, yet city officials insisted upon removing the racks unless the AJC would sign the permit. When the AJC refused to sign the permit, the city confiscated the racks, prompting the AJC to turn to the Court once again. The Court amended its earlier order by enjoining the Department:

> from enforcing the Department of Aviation's newsrack leasing program against AJ & C and USA Today, including removal of the publisher's newsracks and the requirement that the publishers use the newsracks provided.... The method of newsrack distribution of publications in effect prior to April 11, 1996 shall remain in effect for the duration of this injunction. The precise location for each newsrack is to be made by the publisher subject only to a legitimate safety concern, the existence of which first must be conveyed by defendants through defense counsel.

*Atlanta Journal and Constitution v. City of Atlanta Dept. of Aviation,* 1996 WL 509492, at *4, Order of July 11, 1996 (Hunt, J.) (*as amended by* Order of July 12, 1996).

On July 19, 1996 the Department asked the AJC to move some newsracks which posed a fire hazard and the AJC complied with this request. After the city argued in court that placement of newsracks on the concourses depended on securing permission from airlines, the AJC met with representatives of Delta Airlines and agreed to place newsracks in areas leased by Delta.

On July 25, 1996 representatives of AJC experienced what they characterize as a denial of access to the airport to deliver papers. The city contends this encounter was the result of a change of procedure by which AJC representatives would have to be accompanied by an escort. According to the city, upon being told an escort would be required, the AJC refused to deliver the papers. After a hearing, the Court ordered Defendants to take no action to impede the delivery of the paper to the airport and to restore the AJC's security clearance.

During the time the injunction has been in place, the number of newsracks maintained by AJC at the airport has increased from less than twenty to almost 120.

## DISCUSSION

"It is well settled that the right to distribute newspapers through newsracks is protected under the First Amendment." *Gold Coast Publications, Inc. v. Corrigan,* 42 F.3d 1336, 1343 (11th Cir.1994). Of course this right is not absolute; the government's ability to burden that right depends on the nature of the forum. *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.,* 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). An airport is a non-public forum. *International Soc. for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 679, 112 S.Ct. 2701, 2706, 120

L.Ed.2d 541 (1992); *Iskcon Miami, Inc. v. Metropolitan Dade County, Florida*, 147 F.3d 1282, 1286 (11th Cir.1998).

■ In a non-public forum restrictions on speech are permissible so long as they are viewpoint-neutral and reasonable. *Perry Educ. Ass'n*, 460 U.S. at 45, 103 S.Ct. at 954; *Sentinel Communications Co. v. Watts*, 936 F.2d 1189, 1201 (11th Cir.1991). "The reasonableness of the Government's restriction of access to a non-public forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 809, 105 S.Ct. 3439, 3453, 87 L.Ed.2d 567 (1985). "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *U.S. v. Playboy Entertainment Group, Inc.*, —— U.S. ——, 120 S.Ct. 1878, 1881, 146 L.Ed.2d 865 (2000).

Thus, the first question is whether the publishers' protected expressive activity is consistent with the purposes of the forum. The Court finds this threshold inquiry easily satisfied as no aspect of selling newspapers through newsracks is inherently inconsistent with facilitating air travel, which is the primary purpose of the airport. *See ISKCON Miami, Inc.*, 147 F.3d at 1286. In fact, commercial activity is plainly an important secondary purpose of an airport, especially a large airport like Atlanta's. *See Multimedia Pub. Co. of South Carolina, Inc. v. Greenville–Spartanburg Airport Dist.*, 991 F.2d 154, 163 (4th Cir.1993).

This means that for the Government to restrict newsracks, it must show a reason for its actions. A Government restriction will survive reasonableness review if it "rings of common sense." *ISKCON Miami, Inc.*, 147 F.3d at 1287 (quoting *U.S. v. Kokinda* 497 U.S. 720, 735, 110 S.Ct. 3115, 3124, 111 L.Ed.2d 571 (1990) (plurality opinion)) (describing disruption and delay

sought to be avoided by banning solicitation on Postal Service property). The restriction "need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 809, 105 S.Ct. at 3452. The availability of alternative channels of communication is a factor which bears on the reasonableness of the regulation. *U.S. v. Gilbert*, 920 F.2d 878, 886 (11th Cir. 1991).

The AJC contends the plan is unconstitutional for four different reasons. Each will be considered in turn.

1. Number and Placement of the Newsracks

■ Plaintiffs contend the city's 1996 plan is unconstitutional in that the city restricted the publishers' ability to distribute their papers without having a reasonable basis for doing so. The Department contends it is entitled to summary judgment on this issue because it enacted reasonable restrictions based on its interests in generating revenue, aesthetics, safety, and passenger convenience.

Neither side is entitled to summary judgment on this aspect of the plan. On one hand, the number and placement of the newsracks appears to be in keeping with historical locations (in the terminal), and actually expanded the number of newsracks available to the AJC from eighteen to about thirty. This factor cuts against the Court ruling as a matter of law that the plan is unreasonable.

On the other hand, the reasons offered by the Department are quite susceptible to attack as being post-hoc, pretextual justifications for actions purely motivated by a desire to benefit from a business relationship with Coca–Cola. Even in a non public forum the "special solicitude" in favor of affecting protected First Amendment activity means "it isn't enough [for the government] simply to establish that the regu-

lation is rationally related to a legitimate governmental objective." *See Multimedia Pub. Co.*, 991 F.2d at 159. The Department may not do what it pleases to restrict protected expression and then simply articulate legitimate reasons which did not receive consideration in the decisionmaking process. *See id.* at 161 ("While the government's interest in aesthetics is undoubtedly legitimate, the interest's assertion, without more, is not sufficient to carry the day and permit the restriction of protected expression.").

The Court's grave doubts as to whether the city's asserted reasons had any basis in fact prevent the Court from ruling this aspect of the 1996 plan is reasonable. The Department attempts to justify the plan based on security concerns, but the head of security admitted he was neither consulted nor involved in formulating the plan. The city's asserted interest in aesthetics rings hollow in light of the presence of numerous other types of vending machines which are not subject to the same kind of restrictions. The asserted interest in passenger convenience is not worthy of credence either because the city never considered this factor in choosing how many boxes to use or in selecting locations for the boxes.[3]

In formulating the 1996 plan the city did not consider the reasons it now offers to justify the number and placement of the boxes. Accordingly, the Court may not rule as a matter of law that the 1996 plan is reasonable in its treatment of the placement and number of newsracks.

### 2. The Use of Newsracks Bearing Coca–Cola Advertisements

The 1996 plan restricted the size in which the publishers may display their own logos while demanding the newsracks feature large advertisements for Coca–Cola. This aspect of the plan is unconstitutional.

This is an impermissible regulation of speech because the distinction based on speaker identity is unreasonable. "Control over access to a non-public form can be based on subject matter and speaker identity so long as the distinctions are reasonable in light of the purpose served by the forum and are viewpoint-neutral." *Cornelius*, 473 U.S. at 806, 105 S.Ct. at 3451. Here, the city has controlled access to the non-public forum based on the identity of the speaker. Under the plan, Coca–Cola placed large advertisements on the newsracks while the publishers' ability to identify their own products was severely limited. "[T]he government may draw distinctions based on content in order to preserve government property for its intended uses." *ISKCON Miami, Inc.*, 147 F.3d at 1288 n. 5. As there is no principled reason based on the intended use of an airport to justify distinguishing between the speakers in this manner, this aspect of the plan is unconstitutional. The entire reason for allowing Coca–Cola to use the city-owned newsracks was to foster the city's relationship with the company which was underwriting city-sponsored cultural programs. This reason cannot support the government's action in compelling publishers wishing to sell papers through newsracks to associate their publications with Coca–Cola products.

### 3. Fees

The Department's 1996 plan included a $20 per month fee to be charged to a publisher for each newsrack. The Department contends this is a reasonable requirement which serves the city's interest in generating revenue. Plaintiffs maintain a fee such as this is only permis-

---

**3.** Coca–Cola representatives directed the placement of the boxes. When a Coke official asked how many boxes it could have, the airport's Deputy General Manager responded simply, "How many do you want?" (Baker Dep. at 100.)

sible to the extent it can be tied to the administrative costs associated with the plan.

It is on this issue that the most fundamental difference of opinion materializes. Understanding the case law relied upon by the parties illuminates this difference of opinion. The Department contends that generating revenue is a legitimate goal when the government acts in a proprietary capacity. The Department relies upon *Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority*, 745 F.2d 767 (2nd Cir.1984). In that case, the Second Circuit reversed the grant of summary judgment in favor of the publishers by which the district court had enjoined the authority from imposing revenue raising fees as part of its regulation of newsracks in commuter train stations.

In planning to begin distribution of USA Today in the New York area, the publisher contacted the Metropolitan Transport Authority ("MTA") seeking permission to place about 100 newsracks in MTA stations. MTA entered into contracts with publishers wishing to place newsracks in the stations, and in so doing its employees were guided only by the policy of "maximizing its revenues." *Id.* at 771.

In upholding the validity of the fees in the face of Gannett's constitutional challenge, the court recognized:

> Ordinarily, a government cannot profit by imposing licensing or permit fees on the exercise of a First Amendment right. Only fees that cover the administrative costs of the permit or license are permissible. In those cases in which licensing fees were prohibited, however, the government was acting in a governmental capacity and was raising general revenue under the guise of defraying its administrative costs.

*Id.* at 774 (citation omitted). Because the MTA acted in a proprietary capacity in operating the commuter passenger service, the court held that the licensing fees were "permissible manner restrictions which serve the significant governmental interest of raising revenue for the self-sufficient, efficient operation of commuter lines." *Id.* at 775; *see also Jacobsen v. City of Rapid City, South Dakota*, 128 F.3d 660 (8th Cir.1997) (city acted in proprietary capacity, thus was justified in banning newsracks from airport based on its legitimate interest in generating revenue).

While this Court cannot deny that the approach adopted by the Second Circuit is in some ways appealing, Eleventh Circuit authority forecloses this approach. In *Sentinel Communications Co. v. Watts*, 936 F.2d 1189 (11th Cir.1991), the court addressed the constitutionality of a scheme to regulate newsracks in Florida rest areas. First, the court determined the rest area at issue was a non-public forum. As a condition on placing newsracks in the rest area, the publisher was required to agree to pay a five cent administrative fee for each paper sold. The district court had found this was a "valid and reasonable contractual condition[ ] on Sentinel's placement of its newsracks at the rest area." *Id.* at 1205.

The Court of Appeals disagreed:

> First, it is well established that a licensing fee is permissible, but a state or municipality may charge no more than the amount needed to cover administrative costs. The government may not profit by imposing licensing or permit fees on the exercise of first amendment rights, and is prohibited from raising revenue under the guise of defraying its administrative costs.

*Id.* (citation omitted). In *Sentinel*, the official who set the charge simply telephoned transportation officials in other states to come up with the five cent charge and did not perform cost studies or keep cost records to justify the charge. Simi-

larly, in the present case airport officials never considered the actual costs of administering the program. Instead, officials contacted other airports to learn about other newsrack programs.

The Department, rather than attempt to justify the $20 monthly fee under *Sentinel,* maintains the case does not apply. The Department contends that in running an airport the city acts in a proprietary capacity to manage a business, and this is fundamentally different than the governmental activity considered in *Sentinel.* The Court finds the activity undertaken by the State of Florida in *Sentinel* sufficiently similar to the Department's activity in this case to warrant applying the principles employed in *Sentinel.*

In *Sentinel,* Florida began charging fees for placing newsracks in its rest areas after beginning a program to remodel the rest areas to build state-run gift shops. *Id.* at 1191. While the primary purpose of the rest area is to provide motorists a place to take breaks while traveling, Florida clearly had an interest in generating revenue from sales at the gift shops. Thus, commercial activity benefitting the government became a secondary intended purpose of the rest areas. Moreover, Florida made an effort to maximize its revenues (ostensibly to cover its costs of providing rest areas) by charging a fee for each paper purchased from a newsrack.

Here, the Department maintains an airport with the primary purpose of facilitating air travel. A secondary purpose of the airport is commercial activity, much of which is designed to benefit the government by offsetting costs of running the airport. *Sentinel* prevents the government from charging a fee for engaging in expressive activity unless that fee is reasonably tied to administrative costs. The

rest area and the airport are not so different as to preclude the application of this rule.

*Sentinel* makes is clear that even in a non-public forum which is operated, in part, to generate revenue for the government, the government may not charge a licensing fee which is not tied to administrative costs. The Department has produced no evidence to justify the 1996 plan's $20 per month fee as being tied to administrative costs.[4] As the Department, which bears the burden of proof, has failed to produce evidence to justify this fee, the AJC and USA Today are entitled to summary judgment on this aspect of the plan.

### 4. Unbridled Discretion

■ The AJC and USA Today contend the 1996 plan is also constitutionally infirm in that it vests unbridled discretion in airport personnel who may choose which publications are granted access to the city-owned newsracks. The Court agrees. In *Sentinel,* the Eleventh Circuit considered the publisher's facial challenge to Florida's "scheme" for regulating newsracks in its interstate rest areas. In so doing, the court once again made no distinction between the government acting as sovereign and acting in a proprietary, revenue generating capacity. Accordingly, the principles driving the unbridled discretion inquiry set out in *Sentinel* apply with equal force in the present case.

In *Sentinel,* the court explained the rationale for allowing facial challenges where government officials are allegedly vested with unbridled discretion in choosing one speaker's message over another's:

> A court may invalidate an excessively broad grant of discretion on its face, without regard to the particular facts of

4. The Department's evidence regarding the prices the papers pay to have their products in shops and the rates it charges for retail space does not establish the required link between the fee and administrative costs. The costs of doing business are not the same as the costs of administering a licensing scheme.

the plaintiff's case, because the very existence of the discretion lodged in the public official is constitutionally unacceptable. By facially invalidating broad grants of discretion, the Supreme Court has revealed that the problem is not potential abuses but the very existence of broad censorial power.

*Id.* at 1197 (internal quotation marks and citation omitted). In *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), the Court invalidated an ordinance which gave the mayor the authority to deny applications for permits to place newsracks on public property. In striking down the ordinance, the Court noted, "the face of the ordinance itself contains no explicit limits on the mayor's discretion." *Id.* at 769, 108 S.Ct. at 2150.

Even the most cursory review of the 1996 plan reveals that it suffers from even more debilitating constitutional infirmities than the ordinance struck down in *City of Lakewood*. The Department's 1996 plan provides, in relevant part:

Term: The permit shall be cancelable by either party on thirty (30) days notice.

Allocation: Requests for locations will be subject to availability at the time of the request and the desire of the Department of Aviation to present a diversity of publications in a coherent manner.

(News Box Term Sheet; Complaint Exh. E.) The only guidance offered to the official administering this plan is the elusive "desire of the Department of Aviation to present a diversity of publications in a coherent manner." This is no guidance at all, and is terribly susceptible to abuse by an official harboring a desire to oppress

certain views. The danger presented by the plan's lack of standards in allocating space is compounded by the Department's ability to cancel a permit without offering any kind of reason at all.[5] In *City of Lakewood* the ordinance required the mayor to provide a reason for the denial of a permit, yet this ordinance was struck down for vesting the official with unbridled discretion. As the Department's 1996 plan offers even less protection against the imposition of censorship, it too fails to pass constitutional muster.

The city contends its program does not vest unbridled discretion in the person administering it because it allocates space on a first come, first served basis. Nothing in the News Box Term Sheet or the Department's June 26, 1996 letter indicates the program was to be administered on a first come first served basis. Even if it did, the plan still would be unconstitutional because of its cancellation provision. This is so because even if space were allocated neutrally in the first instance, the mere existence of the power to exclude a publication for no reason at all could "intimidate[ ] parties into censoring their own speech." *City of Lakewood*, 486 U.S. at 757, 108 S.Ct. at 2144.

**DECLARATORY JUDGMENT**

Based on the foregoing, the Court hereby **DECLARES** the City of Atlanta Department of Aviation's 1996 plan **UNCONSTITUTIONAL.**

**INJUNCTION**

The city has been subject to constraints imposed by this Court's preliminary injunction for over four years. From the outset, the conduct of the Department has indicated an intention to regain control of the use of newsracks as soon as possible. There is nothing wrong with that desire,

---

5. It is unclear who would be responsible for administering the plan. The lack of specificity in the plan contributes to making it vulnerable to a facial challenge, as it is the lack of standards governing official action which is the essence of unbridled discretion.

but the city must act within limits. Based upon the history of this case and the Department's announced intentions regarding future newsrack plans, the Court concludes that injunctive relief is required to assure compliance with the terms of this Order.

Accordingly, The City of Atlanta Department of Aviation is hereby **PERMANENTLY ENJOINED** from enacting any newsrack plan at Hartsfield Atlanta International Airport which features any of the following characteristics.

(1) The Department must not adopt a newsrack plan which forces publishers to use newsracks bearing advertisements for other products;

(2) the Department must not adopt a newsrack plan which requires publishers to pay a fee which is not tied to the Department's costs in administering its newsrack plan; and

(3) the Department must not adopt a newsrack plan which vests unbridled discretion in the person or persons responsible for

(A) selecting publications which may place newsracks at the airport, or

(B) determining whether publications which are allowed to place newsracks at the airport may continue to maintain newsracks at the airport.

## CONCLUSION

AJC's Motion for Summary Judgment [113–1] is **GRANTED in PART and DENIED in PART.** USA Today's Motion for Summary Judgment [6] [113–1] is **GRANTED IN PART and DENIED in PART.** Defendant's Motion for Summary Judgment [114–1] is **DENIED.**

---

6. In Case No. 96–CV–7847 USA Today's Motion for Summary Judgment is Docket No. 84–1; the Department's Motion for Summary Judgment is Docket No. 83–1 in that case.