BIRCH, Circuit Judge:
In this appeal, we decide whether a government agency, statutorily charged to be self-sufficient and acting in such proprietary capacity, is permitted to assess profit-conscious fees on expressive activities for use of distribution facilities in a non-public forum. The district court found that the assessment of any fee in excess of administrative costs was contrary to the First Amendment of the United States Constitution and precedent in this circuit under Sentinel Communications Company v. Watts, 936 F.2d 1189 (11th Cir.1991). The district court granted a permanent injunction against the City of Atlanta Department of Aviation, prohibiting, inter alia, the City of Atlanta from charging newspaper publishers any fee for the use of the Hartsfield Atlanta International Airport’s newsracks in excess of the administrative costs associated with that use.[1] On appeal, we affirmed the district court’s permanent injunction.[2] Subsequently, we vacated our decision and granted a rehearing en banc.[3] After rehearing, we overrule part of our *1302 prior decision and hold that a government agency, statutorily mandated to be self-sufficient and acting pursuant to that charge, is permitted to assess a reasonable profit-conscious fee to newspaper publishers for the use of the airport’s distribution facilities. Accordingly, the district court’s grant of summary judgment with regard to the 1996 Plan[4] fees provision and consequent injunction is VACATED and the case is REMANDED.
I. BACKGROUND
A. Hartsfield Atlanta International Airport
Hartsfield Atlanta International Airport (the “Airport”), located in Atlanta, Georgia, is owned by the City of Atlanta (the “City”). Pursuant to statutory authority, the City of Atlanta Department of Aviation (the “Department”) operates the Airport. O.C.G.A. § 6-3-1, 6-3-20; City of Atlanta Charter § l-102(c)(9). The Department is required to operate the airport in a proprietary manner and is vested with authority to charge fees for the use of airport space by any “revenue-producing activity.” Atlanta City Code §§ 22-62 & 22-82. The City Code also restricts the use of these fees to the “cost of constructing, paying debt service on maintaining and operating the airport, together with the incidental navigation facilities, and maintaining the airport in a reasonably safe condition.” Id. § 22-81. The fees cannot be used by the City as general revenues.
Moreover, the Airport receives federal funding and therefore is required, to the extent reasonable, to operate the airport in a self-sufficient manner. 49 U.S.C. § 47107(a)(13). The federal law, with few exceptions, mandates that airport revenues be used exclusively for capital or operating costs of the airport, and prescribes provisions for accountability and enforcement of same. See §§ 47107(b)(1) and (l). The intent of Congress is clear. The statutory policy statement, found in § 47101, provides that the “airport fees, rates, and charges must be reasonable” and
that airports should be as self-sustaining as possible under the circumstances existing at each particular airport and in establishing new fees, rates, and charges, and generating revenues from all sources, airport owners and operators should not seek to create revenue surpluses that exceed the amounts to be used for airport system purposes and for other purposes for which airport revenues may be spent under section 47107(b)(1) of this title, including reasonable reserves and other funds to facilitate financing and cover contingencies.
§ 47101(a)(12) and (13). Thus, on both federal and state levels, the Airport is charged with the responsibility to operate its facility focused on its “bottom line.”
The Airport is uniquely situated to profit from the patronage of the travelers frequenting its concourses. On a yearly basis, over sixty-three million people pass through the Airport. Although located in the City, the Airport is an island of commercial activity. Thus, given the captive market of the harried travelers, the Airport and its vendors have virtually monopolistic access to supply items of convenience, refreshment and entertainment, often at prices stretching the outside capacity of an otherwise inelastic demand curve. Approximately one-half of the Airport’s revenue is generated by concessions and parking. This monopoly position also extends to any vendor or advertiser desir *1303 ing to lease space in the Airport facility because the Department has sole authority to lease the premises to whomever it chooses. For example, in 1996 the Airport, through an agency, charged between $62 and $111 per square foot per month for advertising space.
B. Pre-Plan Netvspaper Distribution Methods
In the fifteen years prior to 1995, the Airport was party to a master concessions agreement, which delegated the exclusive right and responsibility to market concessions to Dobbs, Pascal, Midfield Corporation. Airport News, the newsstand concessionaire, sub-contracted for the exclusive right to sell newspapers in the Airport. Initially, only newsstands sold newspapers.[5] As part of its contract, Airport News newsstands were required to carry The Atlanta Journal and Constitution, USA Today, and The New York Times. In 1980, The Atlanta Journal-Constitution (“AJC”) attempted to place its own newsracks in the Airport, and Airport News sued AJC’s publisher, Cox Enterprises, over the unauthorized placement of newsracks in the Airport. Pursuant to a settlement agreement with AJC, Airport News permitted that newspaper publisher to distribute newspapers in eighteen stand-alone newsracks, located as approved by Airport News so as not to detract from the newsstand revenues. AJC paid Airport News a fee of 30% of the gross revenue from newspapers sold through newsracks at the Airport, a portion of which (approximately 11%) was remitted to the City by the concessionaire. USA Today paid a 20% fee derived from gross newsrack sales under a similar arrangement. In eom-parison, the Airport received not less than 20% of the gross revenue from other vending machines. The master concession agreement expired in September 1995.
In 1995, the Airport and the City were undertaking a physical and operational restructuring in preparation for the 1996 Summer Olympic Games. The Airport management took this opportunity to renovate the Airport and revamp the appearance and services available to the public coming to and through the Airport. A main focus of their efforts was to provide a more customer-friendly concession selection and to “giv[e] a sense of place” to the Airport. Baker Dep. at 40:4-11. When the master concessions agreement expired, the City resumed sole control over the newsracks. During the renovation construction period, most newsracks were removed, and the newspapers stopped paying the monthly assessment on the remaining newsracks. The Airport sought to establish a uniform newsrack policy and developed a plan for appropriating standard newsracks and leasing them to the newspaper publishers (the “Plan”). The Plan spawned six years of litigation, culminating in this appeal.
C. The Plan
The Airport, in part through the efforts of Steve Baker, Deputy General Manager of the Department, developed a “Design Criteria” and concessions plan involving, inter alia, the distribution of newspapers. The underlying theme, as explained to the newspaper publishers, was to “control the appearance of customer service concessions and reduce visual clutter.” R3^47, *1304 Baker Aff. at 5, ¶ 14. Underlying these stated goals was the general understanding that the Airport was statutorily mandated to operate in a self-sufficient manner, and therefore the generation of profits was integral to the Plan.
Four components of the Plan were at issue before the district court. While one part of the Plan will command the main focus of our attention, a general overview of each point is helpful.[6] First, the Airport determined that it would provide uniform City-owned newsracks placed strategically throughout the Airport and leased to the various newspapers. Individualized racks were no longer permitted in the Airport. Second, per a joint venture with The Coca-Cola Company (“Coca-Cola”®), these newsracks were outfitted with Coca-Cola advertising. Coca-Cola, in exchange, financed one-half of the capital outlay for the newsracks. The AJC had also been approached by the Department with the proposition of designing and supplying uniform newsracks, yet it chose not to participate. Ultimately, Coca-Cola designed and procured the newsracks, financing one-half the cost as agreed. The newspapers were informed that any other advertising displays on the newsracks by the newspaper publishers were not permitted, other than a single content-identifying strip, subject to Department approval.[7]
Third, the newspapers were required to apply to the Department for a permit to place their newspapers in the City-owned newsracks. The newspapers would remain responsible for the daily maintenance and inventory of their newsracks. Either the Department or the newspaper could terminate the permit on thirty days’ notice. “Requests for locations [were] subject to availability at the time of the request and the desire of the Department of Aviation to present a diversity of publications in a coherent manner.” Rl-1, Ex. E, News Box Term Sheet.
Fourth and finally, the primary issue before us is the $20 per month rental fee charged to the newspapers for the use of each newsrack. The Department submitted evidence to partially demonstrate how this $20 figure was determined. The original newsrack cost $500; half of that amount was financed by Coca-Cola. The newsracks were assigned a useful life of 5 years, over which the Department sought to recoup the $250 balance. The useful life was determined by the Department “to maintain the level of appearance at the airport.” Baker Dep. at 222:14-15. There was no empirical evidence introduced to reflect the useful life of a newsrack. The fee included an additional “airport-required” 7% return on its investment to compensate for the cost of capital. R3-47, Baker Aff., Ex. 7.
D. The Permanent Injunction
On 9 July 1996, AJC filed a complaint in the district court, claiming that the Plan was unconstitutional and requesting in-junctive relief and a temporary restraining order (“TRO”). On 10 July 1996, the district court conducted a hearing and grant *1305 ed the TRO. USA Today filed a similar action and, on 18 November 1996, the USA Today case was consolidated. On 24 January 1997, The New York Times filed a motion to intervene and the district court granted that motion on 29 May 1997.[8]
On 24 July 2000, the district court granted summary judgment in part and enjoined the Department from enforcing any newsrack plan. The district court denied summary judgment on the issue as to whether the Department was permitted to restrict the number and placement of the newsracks, finding it could not rule as a matter of law on the reasonableness of the Plan. The court granted summary judgment on the other three bases. First, the court found that the Coca-Cola advertising portion of the plan was unconstitutional because it contained an unreasonable distinction based upon speaker identity. Second, the court found the fees provision was impermissible because the Department charged in excess of administrative costs, conduct contrary to our decision in Sentinel Communications Company v. Watts, 936 F.2d 1189 (11th Cir.1991). Third, also relying on Sentinel, the district court ruled that the Department’s unrestrained discretion in deciding which publications were given permits for the newsracks was unconstitutional. Upon these bases, the district court granted a permanent injunction prohibiting the Department from
enacting any newsrack plan at Harts-field Atlanta International Airport which features any of the following characteristics:
(1) The Department must not adopt a newsrack plan which forces publishers to use newsracks bearing advertisements for other products;
(2) the Department must not adopt a newsrack plan which requires publishers to pay a fee which is not tied to the Department’s costs in administering its newsrack plan; and
(3)the Department must not adopt a newsrack plan which vests unbridled discretion in the person or persons responsible for
(A) selecting publications which may place newsracks at the airport, or
(B) determining whether publications which are allowed to place newsracks at the airport may continue to maintain newsracks at the airport.
AJC I, 107 F.Supp.2d at 1384.
On 22 August 2000, the Department filed an appeal. We issued our opinion, affirming the district court. However, we expressed reservation as to whether it would be appropriate for the Department, acting in a proprietary capacity, to assess a profit-generating fee in excess of administrative costs. AJC II, 277 F.3d at 1329. On 24 July 2002, we vacated the panel’s opinion and ordered this case to be reheard en banc.
II. DISCUSSION
A. First Amendment Scrutiny
The distribution of newspapers, no less than the publication of the newspapers themselves, is an activity protected by the First Amendment. Lovell v. City of Griffin, Ga., 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938). Accordingly, a government (here, the City) is subject to certain limitations on the type and content of the restrictions it may place on this activity.
Generally speaking, the City is precluded from making content-based restrictions on expression protected by the First Amendment unless it advances a compelling interest and employs the least restric *1306 tive means to advance that interest. Sable Communications of Cal., Inc. v. FCC, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989). However, the City may regulate expression on non-content grounds through “reasonable time, place, and manner restrictions,” see, e.g., Clark v. Community for Creative Nonr-Violence, 468 U.S. 288, 298-99, 104 S.Ct. 3065, 3071-72, 82 L.Ed.2d 221 (1984), consistent with the notion that “[c]ivil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses.” Cox v. New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941).
This statement of the law controls when the City seeks to regulate speech within a public forum or a designated public forum, as those places have come to be understood in First Amendment jurisprudence.[9] See Int’l Soc. for Krishna Consciousness, Inc. v. Lee (“ISKCON"), 505 U.S. 672, 678, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992). If the property is a public forum or a designated public forum, then any content-based restrictions on speech within that forum are highly scrutinized: the restrictions must be narrowly drawn to serve a compelling state interest. Id. “In a public forum, by definition, all parties have a constitutional right of access and the state must demonstrate compelling reasons for restricting access to a single class of speakers, a single viewpoint, or a single subject.” Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 55, 103 S.Ct. 948, 960, 74 L.Ed.2d 794 (1983).
When the City seeks to regulate speech on government-owned property which is not a public forum or a designated public forum, the standard is modified, becoming more deferential to regulation. If the property is a nonpublic forum, then the City “ha[s] ‘no constitutional obligation per se to let any organization use the [forum].’” Id. at 48, 103 S.Ct. at 957 (quoting Connecticut State Fed’n of Teachers v. Board of Educ. Members, 538 F.2d 471, 481 (2nd Cir.1976)). “The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.” United States Postal Serv. v. Council of Greenburgh Ass’ns, 453 U.S. 114, 129-130, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981) (quotation marks and citation omitted). “[0]n government property that has not been made a public forum, not all speech is equally situated, and the state may draw distinctions which relate to the special purpose for which the property is used.” Perry, 460 U.S. at 55, 103 S.Ct. at 960.
Therefore, in a nonpublic forum, the City may properly restrict exercise of expression that is inconsistent with the intended use or function of that property through reasonable, viewpoint-neutral regulations. See ISKCON, 505 U.S. at 679, 112 S.Ct. at 2705. That is, even content-based restrictions, which in other venues would be subject to strict scrutiny, are constitutional so long as they are a reasonable, viewpoint-neutral attempt to ensure that the facility serves its intended purpose. “Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public *1307 forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property.” Perry, 460 U.S. at 49, 103 S.Ct. at 957. This deferential standard is a “much more limited review” than that applicable in a public or designated public forum. ISKCON, 505 U.S. at 679, 112 S.Ct. at 2705.
In this case, the forum in question is the Airport, which is City-owned. Government-owned commercial airports, such as Hartsfield, are not public fora. Id. at 680-82, 112 S.Ct. at 2706-08. There is no argument from the parties that the airport is a designated public forum under the circumstances of this case, and, accordingly, we will employ the more deferential standard appropriate for regulation of nonpublic forum expressive activity.
Our examination of the Plan is restricted to two major bases that led the district court and our panel to declare the scheme unconstitutional: first, the profit-conscious fee for rental of the newsracks, and, second, the unrestrained discretion vested in a government official responsible for setting that fee and choosing which publications could use the newsracks. Though the Department has proffered numerous reasons to support its newsrack regulation, we need discuss only one, its interest as a proprietor, to resolve the first issue before us.[10] The regulations are constitutionally valid if they are reasonable and viewpoint neutral. We find no question that the regulations are viewpoint neutral, and, therefore, we focus on their reasonableness below.
B. Reasonableness
To sell newspapers from newsracks at the Airport, a vendor must pay a fee, set entirely in the discretion of the Airport authorities, for one or more of the designated newsracks placed in an approved area of the main terminal. No private newsracks may be installed, nor may any of the available newsracks be modified or moved to other areas of the terminals. The fee required by the Airport for use of these terminals includes a profit component; the fee is above and beyond that amount needed to recoup administrative costs surrounding the installation and maintenance of the newsracks by the Airport. In simplest terms, the Department, in a manner indistinguishable from private sector business, charges the publishers rent for the privilege of selling their papers through the Airport’s newsracks.
We examine the City’s restrictions for reasonableness given the surrounding circumstances. Restrictions must only be reasonable; “[they] need not be the most reasonable or the only reasonable limitation[s].” ISKCON, 505 U.S. at 683, 112 S.Ct. at 2708 (quoting United States v. Kokinda, 497 U.S. 720, 730, 110 S.Ct. 3115, 3122, 111 L.Ed.2d 571 (1990) (plurality *1308 opinion)). The contours of the allowed distribution are not dictated by the publishers’ preferences; the First Amendment does not guarantee the least expensive method of distribution, and the City is free to approve an alternative scheme that results in higher costs for the publishers, assuming that such scheme is reasonable overall. Kovacs v. Cooper, 336 U.S. 77, 88-89, 69 S.Ct. 448, 454, 93 L.Ed. 513 (1949) (plurality opinion). Thus, we apply this reasonableness standard to the two issues before us, the profit-conscious fee and the discretion granted to the responsible official.
1. ProfiWConscious Fee
The central thrust of the publishers’ argument concerns the ability of the Department to charge a profit-conscious fee for use of the Airport’s newsracks. A profit-conscious fee cannot be justified by reference to any of the Airport’s stated concerns about security, or aesthetics, or traffic flow. Rather, to support a profit-conscious fee, the Department must point to its interest in maintaining the Airport as a business.
According to the publishers, any fee charged on an activity protected by the First Anendment must be limited to the recoupment of administrative costs associated with that activity; the fee cannot be a method of enhancing general government revenue. In advancing this argument, the publishers point to a line of Supreme Court cases that makes this very point. See Murdock v. Pennsylvania, 319 U.S. 105, 113-14, 63 S.Ct. 870, 875-76, 87 L.Ed. 1292 (1943); Cox, 312 U.S. at 577, 61 S.Ct. at 766.
This line of cases does not control the instant case. The Airport is operated as a self-sufficient business by the City, as mandated by statute and required by federal regulation, and the Plan at issue here is an outgrowth of its role as a business proprietor rather than its ordinary role as a regulator. “Where the government is acting as a proprietor, managing its internal operations, rather than acting as a lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject.” ISKCON, 505 U.S. at 678, 112 S.Ct. at 2705.[11] See also Kokinda, 497 U.S. at 725, 110 S.Ct. at 3119 (citing Cafeteria & Rest. Workers Union v. McElroy, 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961) (finding that consideration of what due process was required in that case turned in part on whether the government exercised power as a regulator or a proprietor) and Lehman v. City of Shaker Heights, 418 U.S. 298, 303, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (plurality opinion) (stating that, “in much the same way [as] a newspaper or periodical,” the city could enact reasonable restrictions on expression when “engaged in commerce” and when the restriction on speech was “a part of the commercial venture”)). However, “[t]he Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business, but its action is valid in these circumstances unless it is unreasonable, or, as was said in Lehman, [418 U.S. at 303, 94 S.Ct. at 2717,] ‘arbitrary, capricious, or invidious.’” Kokinda, 497 U.S. at 726, 110 S.Ct. at 3119.
*1309 a. Reasonableness of fee
The proprietor capacity distinction suggests that reasonableness, for purposes of forum analysis, includes a commercial component. In a proprietary capacity, the City has a substantial interest in the “bottom line,” and, when the City acts as a proprietor, reasonable regulations .may include profit-conscious fees for access for expressive conduct, in a manner similar to fees that would charged if the forum was owned by a private party (i.e., a fee for a auditorium for a dance recital, or a fee for displaying advertisements in a newspaper).
Here, the fee is facially reasonable; it does not appear that the Department is applying monopolistic muscle to the publishers. It would be different if the Department set a prohibitively high fee for use of the newsracks. However, the charges imposed do not strike us as outside the reasonable bounds for this alternative distribution channel granted to the publishers. In addition, the history of regulation at the Airport and the availability of alternative distribution methods for the publishers bolsters the Plan’s reasonableness.
History of regulation can be a guarantor that current regulations are constitutionally reasonable. See Kokinda, 497 U.S. at 731, 110 S.Ct. at 3122. The publishers of newspapers at the Airport were subject to profit-conscious fees for use of newsracks even before the imposition of the current Plan, when the exclusive right of newspaper distribution in the airport was granted to Airport News, an independent concessionaire. The publishers, pursuant to negotiated contracts, paid 30% of them revenues to the concessionaire in exchange for the right to place newsracks in the Airport and distribute their wares. A portion of that fee was remitted to the Department. There is no indication that these historical fees were in any way tied to, or limited by, administrative costs. These historical fees do not seem dramatically out of proportion to the flat fee imposed by the Plan.
The availability of alternative distribution methods for the newspapers at the Airport also weighs in favor of finding the Plan constitutional. See Perry, 460 U.S. at 53, 103 S.Ct. at 959. The three appellee newspapers all find themselves with guaranteed distribution channels, because the newsstand vendors are required to carry those papers in their stores as a component of their lease with the Airport. Newsstands are a guaranteed substitute market, and, given the landscape of distribution in the Airport, the complaining newspapers in this case are in a preferred position. In sum, “we think it would be odd to conclude that the [Department’s] terminal regulation is unreasonable despite the [Department] having otherwise assured access to an area universally traveled.” ISKCON, 505 U.S. at 685, 112 S.Ct. at 2709.
b. Special fee
The publishers contend that the imposition of this rent for the news-racks creates a special fee imposed on the press in violation of Minneapolis Star & Tribune Company v. Minnesota Commissioner of Revenue, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983). The First Amendment provides the press no protection from government’s generally applicable economic regulation, but does prevent government from treating the press in a special manner. Id. at 581-85, 103 S.Ct. at 1369-72.
In Minneapolis Star, the State of Minnesota enacted a use tax on the materials necessary for newspaper publication, including paper and ink. Id. at 577, 103 S.Ct. at 1368. In comparison to the general taxation scheme of the state, this particular use tax possessed several unique qualities: first, it did not complement the sales *1310 tax, as most use taxes do, but rather applied even to those products bought instate and subject to sales tax; and, second, it was the only use tax imposed on goods that would eventually be made into retail products, that is, the only use tax on “an intermediate transaction.” Id. at 581-82, 103 S.Ct. at 1370.
Because of these unique characteristics, the Court found that the use tax was “without parallel in the State’s tax scheme,” and “single[s] out the press for special treatment.” Id. at 582, 103 S.Ct. at 1370. It was this targeted, unique tax that presented and particularized the constitutional problem. Id. at 585, 103 S.Ct. at 1371-72.[12] “Differential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional.” Id. at 585, 103 S.Ct. at 1372. In order for the tax to pass constitutional scrutiny, the government must proffer an interest of “compelling importance,” and an interest that cannot be satisfied in a less suspicious way, to counterbalance these dangers of differential treatment. Id.
The fees imposed by the Department on the publishers are not a special tax on the press, and the Minneapolis Star line of cases has no application here. Instead, these fees are part of the general scheme of the Airport to “tax” those vendors who are granted space in the facility. Every vendor, no matter the type of goods sold, must remit to the Airport compensation for the granted right of access to the Airport’s customers. Calling the newsrack fee a “special tax” is unduly formalistic. True, the contracts made by the Department with the publishers involve a different method of computing the fee due than the contracts with other Airport vendors. Moreover, the amount of the fee is not linked by some mathematical scale to the fees imposed on other vendors in the Airport. However, this is not a fee, like that involved in Minneapolis Star, that has no analogue in the general scheme of regulation. All vendors remit to the Airport a fee for the space they lease or a portion of profits from the goods they sell, or a combination of the two. None of these fees imposed on other vendors is limited to recovery of the Airport’s administrative costs. The newsrack Plan is not an aberration within this scheme of vendor regulation.
2. Unrestrained Discretion
A grant of unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional. See City of Lakewood v. Plain Dealer Publ’g Co., 486 U.S. 750, 755-56, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988) (stating that the Supreme Court “ha[s] long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license” (footnote and citations omitted)). Here, we believe that the district court and our panel correctly identified the bound *1311 less discretion granted to the Department official responsible for administering the newsrack Plan as exceeding the bounds of constitutionality. None of the Department’s proffered reasons for regulation, including its interest as a proprietor, can justify this grant of discretion.
While market forces, ceteris paribus, might constrain the fees charged the publishers to reasonable levels, the City, even acting as a proprietor, retains its power to censor. Such power must be cabined by some standard of First Amendment reasonableness over and above the invisible hand of the marketplace. Structural and procedural safeguards can reduce the possibility that an official will use her power to corrupt the protections of the First Amendment. The official charged with administering the Plan should have clear standards by which to accept or reject a publisher’s request to use the newsracks at the Airport. Perhaps a first-come, first-served system, a lottery system, or a system in which each publisher is limited to a percentage of available newsracks would be appropriate vehicles for limiting the official’s .discretion. . We leave the intricacies of the safeguards to the Department, whose knowledge of the practicalities, including consumer demand, can be applied.[13] The official in charge must be constrained in some form in her exercise of discretion.
Therefore, though we find that the Department could impose a profit-conscious fee on publishers who wished to distribute newspapers through newsracks, we also find that the manner in which the Department is able to exercise this prerogative runs afoul of the Constitution’s concern over unbridled official discretion in the First Amendment arena. Thus, we reinstate and re-adopt the following portion of the panel opinion:
[T]he department’s plan contains no explicit limits on airport personnel’s power to cancel news rack licenses. On its face, the plan permits the Department to cancel a publisher’s license for any reason whatsoever, including unconstitutional reasons such as viewpoint discrimination. Such unbridled discretion vests broad censorial power in government and this the Constitution does not permit.
AJC II, 277 F.3d at 1329.
C. Profile-Making Fees on First Amendment Expression
In Sentinel Communications v. Watts, 936 F.2d 1189 (11th Cir.1990), we held that Florida was prohibited from charging publishers five cents per paper sold at news- *1312 racks placed at state-run highway rest stops. According to the Sentinel court, the problem with this fee arose from its revenue-raising character:
[I]t is well established that a licensing fee is permissible, but a state or municipality may charge no more than the amount needed to cover administrative costs. The government may not profit by imposing licensing or permit fees on the exercise of first amendment rights, and is prohibited from raising revenue in the guise of defraying its administrative costs.
Id. at 1205 (citations omitted).
While a government acting facially or impliedly in its capacity as regulator or licensor cannot profit from the exercise of First Amendment rights, it is not the law that a government, universally, is prohibited from imposing profit-making or revenue-raising fees on First Amendment expression. We hold that when a government acts in a proprietary capacity, that is, in a role functionally indistinguishable from a private business, then commercially reasonable, profit-conscious contracts may be negotiated for distribution space in a non-public forum for First Amendment activities, subject to structural protections that reduce or eliminate the possibility of viewpoint discrimination.[14]
III. CONCLUSION
Based on the foregoing discussion, we find that the Department can impose a profit-conscious fee on the use of news-racks in the Airport, but that the discretion surrounding such fee must be restrained through procedures or instructions designed to reduce or eliminate the possibility of viewpoint discrimination. Therefore, we VACATE the injunction entered by the district court to the extent that such injunction prohibited the imposition of a profit-conscious fee for the use of newsracks at the Airport, and we retain that portion of the injunction that prohibited the administration of any plan that did not explicitly constrain official discretion. We REMAND this case to the district court with instructions to afford the Department an opportunity to formulate ascertainable non-diseriminatory standards for the exercise of discretion by the appropriate Department official. Upon remand, the district court should not be precluded from considering the City’s claim, if any, for lost revenues from enjoined fees that we have determined were constitutionally permissible, and, upon approval of the Airport’s new newsrack Plan, this case should be finally resolved.

.Atlanta-Journal & Constitution v. City of Atlanta Dep't of Aviation, 107 F.Supp.2d 1375, 1382, 1384 (N.D.Ga.2000) ("AJC I”).

. Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation, 277 F.3d 1322 (11th Cir.2002) ("AJC II”).

. Atlanta Journal & Constitution v. City of Atlanta Dep’t of Aviation, 298 F.3d 1251 (11th Cir.2002).

. The 1996 Plan (hereinafter the "Plan”) is, inter alia, the City of Atlanta Department of Aviation's proposed policy regarding the selection, placement and fees for the distribution of newspapers through newsracks by newspaper publishers. The different parts of the Plan are described in detail infra.

. For purposes of this opinion, we consider "newsstands” to be attended stores, open for ■business during pre-determined hours, that sell various items, in addition to newspapers, such as snacks, drinks, magazines, sundries, etc. In contrast, a "newsrack” is a standalone vending machine that permits the unassisted customer to purchase a single newspaper at any time.

. Indeed, the facts of this case are set forth in varied detail in the judicial decisions preceding this opinion. Given the limited issue before us, we will not embark on a complete exposition of the history of this case. Instead, we incorporate by reference the facts as set forth in these opinions. See supra notes 1-2. In addition, this case contains a contentious procedural history, which we recognize but will not address.

. Other than this general overview, we are not rehearing and will not be discussing the constitutionality of the Coca-Cola advertising on the newsracks. Our prior panel decision, Atlanta Journal and Constitution v. City of Atlanta Department of Aviation, 277 F.3d 1322 (11th Cir.2002), correctly reviewed the district court's grant of summary judgment on this issue, and we adopt its analysis herein.

. All record citations in this opinion are to the district court's file for the original case filed by The Atlanta Journal and Constitution, No. 1:96-CV 1738 (WBH).

. Based on ISKCON, 505 U.S. at 678, 112 S.Ct. at 2705, there are three cognizable types of government property: (1) the public forum, which is property of a type "traditionally .. . available for public expression”; (2) a desig-naled public forum, which is property specifically designated by the State for expressive activity; and (3) a nonpublic forum, which is all government-owned property not traditionally or explicitly designated as a public forum.

. The newspapers contend that the Department has no evidence to support its proffered reasons for regulating newsracks at the Airport, and that the Department has offered a variety of shifting reasons for that decision throughout this litigation. The district court declined to grant summary judgment for the publishers on the reasonableness of the Department's initial decision to restrict the area and facilities for newsrack distribution, finding that "the reasons offered by the Department are quite susceptible to attack as being post-hoc, pretextual justifications for actions purely motivated by a desire to [profit].” AJC I, 107 F.Supp.2d at 1379.
Given the issues on which we focus during this rehearing en banc, we do not need to examine the myriad of alternate rationales for the Plan, because we ultimately find that the Airport's interest as a proprietor, which no one claims is pretextually held, justifies its imposition of a profit-conscious fee, and we also find that no interest proffered by the Airport justifies its grant of boundless discretion to the official charged with administering the newsrack Plan.

. Justice O’Connor, though concurring separately, agrees with the four Justices who join the plurality opinion that this lawmaker/proprietor distinction exists in First Amendment jurisprudence. However, she is quick to point out, as is apparent through other cases, that the government's status as a proprietor by no means allows unfettered restriction of expression. See ISKCON, 505 U.S. at 687, 112 S.Ct. at 2712 (O'Connor, J., concurring).

. As the Minneapolis Star Court stated:
A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected.... When the State singles out the press ... the political constraints that prevent a legislature from passing crippling taxes of general applicability are weakened, and the threat of burdensome taxes becomes acute. That threat can operate as effectively as a censor to check critical comment by the press, undercutting the basic assumption of our political system that the press will often serve as an important restraint on government.
460 U.S. at 585, 103 S.Ct. at 1372.

. The official may be charged with considering market forces, such as consumer demand, in making his decisions, in keeping with the coexisting interest of the Airport in generating a profit. These decisions as a business are permissible; the regulations exist to constrain the temptation of discriminating among publications on viewpoint grounds, not the temptation of discriminating against publications based on whether they are likely to grant a greater return on investment to the Airport.
The line between denial of a permit for business-related reasons, such as consumer demand, and for unconstitutional reasons, such as viewpoint, is admittedly blurry. Consumer demand may be low for papers that espouse unpopular viewpoints. Therefore, the effect of making decisions based on consumer demand may be to deny all unpopular viewpoints from the Airport's newsracks. Especially given that the newsrack fees in this case are a flat fee — that is, the publishers pay a set fee per month for rental of the newsrack, rather than a percentage of gross receipts from sale of their papers through the news-racks — the denial of a permit for business-related reasons harbors a greater risk that the decision is but a mask for censorship of unpopular viewpoints in contravention of the First Amendment. This risk may be addressed by future regulations concerning newsracks at the Airport.

. We note that at least two other circuits are in accord. See Jacobsen v. City of Rapid City, S.D., 128 F.3d 660, 664 n. 2 (8th Cir.1997); Gannett Satellite Info. Network, Inc. v. Metropolitan Transp. Auth., 745 F.2d 767, 774 (2d Cir.1984); cf. Children of the Rosary v. City of Phoenix, 154 F.3d 972 (9th Cir.1998) (holding that city could properly exclude anti-abortion group from advertising on municipal buses, which advertising was sold for the purpose of raising municipal revenue).