In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 20–1814

JOHN K. MACIVER INSTITUTE
FOR PUBLIC POLICY, INC., *et al.*

*Plaintiffs-Appellants*,

*v.*

TONY EVERS, in his official
capacity as Governor of the
State of Wisconsin,

*Defendant-Appellee*.

———————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:19-cv-00649-jdp — **James D. Peterson**, *Chief Judge*.

———————

ARGUED OCTOBER 30, 2020 — DECIDED APRIL 9, 2021

———————

Before MANION, ROVNER, and SCUDDER, *Circuit Judges*.

ROVNER, *Circuit Judge*. Two reporters from the John K. MacIver Institute for Public Policy, Inc., alleged that they were denied access to a press event held by Wisconsin Governor Tony Evers' office based on the viewpoint espoused by the organization. Because we have found no evidence of

viewpoint discrimination under any First Amendment test with which we might view the claim, we affirm the district court's grant of summary judgment for Governor Evers.

## I.

The importance of a free press to our founders was memorialized in the First Amendment which prohibits the government from abridging the freedom of press, which now, of course, encompasses all forms of media. *See* U.S. Const. amend. I. Thomas Jefferson stated, "Were it left to me to decide whether we should have a government without newspapers, or newspapers without government, I should not hesitate a moment to prefer the latter." We therefore delve into any case alleging suppression of that core right with seriousness and care. Like all rights enumerated in the Bill of Rights, however, it is not absolute. And allegations of suppression of the media must be sufficiently alleged to withstand a ruling on summary judgment.

MacIver describes itself as "a Wisconsin think tank that promotes free markets, individual freedom, personal responsibility and limited government." R. 9 at 1. MacIver Institute sponsors what the plaintiffs call a "separately branded" MacIver News Service with its own Twitter account, its own logo, and its own tab on the MacIver Institute's website. At the time of the facts of this case, William Osmulski was a reporter and a news director for MacIver News Service. Matt Kittle was also a reporter for MacIver News Service. We refer to the plaintiffs collectively as MacIver.

Governor Evers, from time to time, holds events during which he answers questions from members of the press. Some of these events are open to any member of the public, and

others are limited to subsets of the media of varying size. The Governor's communications department maintains a media advisory list that it uses to notify members of the media of various events. The original version of the media list was based on a version used during Governor Evers' campaign and used neutral selection criteria such as newspaper circulation, radio listenership, and TV viewership. In June 2019, after MacIver's counsel sent a letter to the Governor demanding fair and equal treatment, the Governor's Office of Legal Counsel distributed a memorandum providing more substantial guidance for determining how, going forward, media would be granted access to the Governor's exclusive or limited-access events. The memorandum points out that the Governor's office faces logistical and security concerns that prevent unlimited access to press events. R. 15-1. After that it enumerates a non-exhaustive list of factors for the communications department to consider when deciding whether to include any given media outfit on the list, noting that the "most important consideration is that access is based on neutral criteria." *Id.* Those factors are as follows:

> 1. Is the petitioner employed by or affiliated with an organization whose principal business is news dissemination?

> 2. Does the parent news organization meet the following criteria?

>> a. It has published news continuously for at least 18 months, and;

>> b. It has a periodical publication component or an established television or radio presence.

3. Is the petitioner a paid or full-time correspondent, or if not, is acting on behalf of a student-run news organization affiliated with a Wisconsin high school, university, or college?

4. Is the petitioner a bona fide correspondent of repute in their profession, and do they and their employing organization exhibit the following characteristics?

>  a. Both avoid real or perceived conflicts of interest;
>
>  b. Both are free of associations that would compromise journalistic integrity or damage credibility;
>
>  c. Both decline compensation, favors, special treatment, secondary employment, or political involvement where doing so would compromise journalistic integrity; and
>
>  d. Both resist pressures from advertisers, donors, or any other special interests to influence coverage.

5. Is the petitioner or its employing organization engaged in any lobbying, paid advocacy, advertising, publicity or promotion work for any individual, political party, corporation or organization?

*Id.* These factors were adapted from established standards used by the Wisconsin Capital Correspondents Board and the United States Congress, and allow for the inclusion of over

780 e-mail contacts. *Id.* at n.1 & R. 15-2. The MacIver News Service does not meet these criteria although it is currently credentialed by the Wisconsin State Legislature. According to the Governor, MacIver is not included on the Governor's media advisory list because the communications department determined that the MacIver Institute "is not principally a news organization" and "their practices run afoul of the neutral factors" set forth in the memorandum. R. 15 at 6.

The Governor's office describes its press events as falling into one of four categories: public events, press-exclusive events, press briefings, and one-on-one interviews. Public events are, as the name suggests, open to the entire public. For example, Governor Evers appeared at the opening of the Wisconsin State Fair in 2019, and hosted multiple budget listening sessions across the state in spring 2019. These events were open to any member of the public or press who wished to attend. Sometimes these events include a period of time during which the press may ask questions (what the Governor's office calls "press avail"), but there is no limitation on who may attend. In addition to these public events, there are other ways in which the general public, including MacIver, may access news and information from the Governor's office. MacIver, or any member of the public, may follow the Governor's feed on social media and sign up for press releases. MacIver does not allege that it has been denied entry or access to any public events, or public media sources.

The second category of press events consists of limited-access press conferences and other press-exclusive events to which only some members of the press are invited. These events are not open to the general public and press attendance is limited by time, space, and security concerns, as well as

other venue-specific factors. For example, when the Governor toured the University of Wisconsin–Milwaukee School of Freshwater Sciences, only a limited number of journalists were invited on the tour which was followed by a press avail time. The Governor's communications department uses the media advisory list to notify members of the media of these limited-access events, and invitees who wish to attend must RSVP so that the Governor's office and security personnel can prepare accordingly. Depending on the type of event, the Governor's office may also reach out to members of the press with specific interests, such as inviting a science-focused journal to join the tour of the School of Freshwater Sciences.

The third category includes press briefings, which are limited to an even smaller group of invited members of the press. Historically, these have been held as a courtesy to members of the press to provide additional background before the release of large-scale initiatives. These events are off the record—meaning that the information is not intended for public release or as an official representation or statement. Some of the materials provided at a press briefing might be subject to embargoes. Finally, in a fourth category, the Governor may at times grant a one-on-one interview. These are not at issue in this case.

On February 28, 2019, MacIver News Service reporters Osmulski and Kittle got wind of an invitation-only press briefing to be held later that afternoon during which the Governor's office would preview the major initiatives in his budget address scheduled for that same evening. The pair, seeming to understand that this was a "by invitation" event, sent an RSVP to the Governor's staff the day of the event, but did not receive a response before the briefing began. As they

attempted to enter the conference room, they were informed that they were not on the RSVP list and thus could not be admitted. They were told they could talk to the Governor's Deputy Chief of Staff, Melissa Baldauff, but she was not available at that moment to hear their appeal. Because this was a small-scale event, hundreds of other journalists and media personnel were also not invited to attend. For example, Jason Stein, a journalist formerly with the Milwaukee Journal Sentinel and Wisconsin State Journal sent an email to the Deputy Chief of Staff asking to attend, but she denied him admission as he was no longer affiliated with a news organization and instead worked for the Wisconsin Policy Forum, an organization that describes itself as a nonpartisan, independent research organization. In fact, for small-scale events such as the press briefing on February 28, 2019, the communications department layers onto the usual media advisory list the additional requirement that the organization have a readership or viewership justifying inclusion for the particular event.

The MacIver reporters eventually learned that their exclusion from the February 28 event was not an anomaly. The communications department's media advisory list did not include them and thus they would not receive invitations to non-public press events. In response to their initial letter demanding to be included on the list, the Governor's legal counsel responded that the Governor's communications department permits "some journalists to limited-access events, such as exclusive interviews, on a case-by-case basis using neutral criteria, namely newspaper circulation, radio listenership, and TV viewership." R. 7-5. Shortly after that, MacIver sent a public records request asking for, among other things, the criteria used to determine which journalists would be allowed

to access briefings. On the heels of fulfilling MacIver's records request for the media advisory list, on June 26, 2019, the Governor's office issued its neutral criteria memorandum described above.

MacIver sued the Governor claiming that (1) it had been denied equal access to certain events and press emails in violation of the First Amendment; (2) the Governor discriminated against MacIver based on its viewpoint in violation of the First Amendment; and (3) the Governor denied MacIver equal protection of the laws under the Fourteenth Amendment by denying equal access to those events and e-mails. MacIver sought an order declaring its exclusion unconstitutional and ordering the Governor to include MacIver in the future. MacIver moved for a preliminary injunction on August 20, 2019, seeking an order requiring Governor Evers to invite MacIver journalists to "generally available press briefings and events and lists announcing such events." R. 6 at 1. MacIver did not define what it meant by "generally available press briefings." After the decision had been pending for six months, MacIver moved, pursuant to Federal Rule of Civil Procedure 65(a)(2), to consolidate the decision on the preliminary injunction with a decision on the merits, affirming that all necessary evidence had already been filed with the court. The district court denied MacIver's motion for a preliminary injunction, but permitted the plaintiffs ten days to demonstrate why the court should not grant summary judgment in favor of the defendants. On April 14, 2020, after rejecting MacIver's request to file a renewed motion for summary judgment, the court granted summary judgment in favor of Governor Evers. The district court concluded that the press conferences were non-public fora and that the criteria that the Governor had used to accept or exclude media were both

reasonable and viewpoint neutral. We review the district court's grant of summary judgment de novo, construing all reasonable inferences in the light most favorable to MacIver. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## II.

The amount of access to which the government must give the public for First Amendment activities, and the standards by which a court will evaluate limitations on those rights, depends on the nature of the forum at issue. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983). Streets, sidewalks and parks, and the quintessential soap box in the public square fall on one end of the spectrum. We call these traditional public fora. We have the least tolerance for restrictions on First Amendment freedoms in those settings, and the state may only regulate content if it can show that the regulation is necessary to serve a compelling interest and that it is narrowly drawn to achieve that end. *Id.* at 45. The government may regulate the time, place, and manner of the expression where those regulations are narrowly tailored to serve a significant governmental interest and where ample alternative channels of communication remain open. *Id.* There is no question that a traditional public forum is not at issue in this case, but it serves as an important marker of one end zone of First Amendment forum analysis.

The same prohibitions and tests apply to designated public fora—public property that the state has opened for members of the public to use as a place for expressive activity. *Id.* at 45–46. A designated public forum occurs only where the government intends to make the property available to the general public and not simply when it grants access to one individual or even several individuals or groups. *Arkansas*

*Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998). The government does not create a designated public forum where it does no more than reserve access to the forum to a particular group of speakers. *Id.* at 679. Requiring permission, limiting access, and having "extensive admission criteria" as the state does here through the advisory list and invitation and RSVP process, are signs that the government has not created a designated public forum. *Arkansas*, 523 U.S. at 679–80; *Cornelius v. NAACP*, 473 U.S. 788, 804–06 (1985). In short, by inviting a limited number of journalists to its press conferences, the Governor's office has not created a designated public forum.

Finally, the third category describes non-public fora, where the government controls public property which is not, by tradition or designation, a forum for public communication, and is open only for selective access. *Perry*, 460 U.S. at 48. "[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981). The government, like other private property holders, can reserve property for the use for which it was intended, "as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46. When the government limits participation only to "appropriate" participants or has extensive admission criteria, it has not created a public forum. *Cornelius*, 473 U.S. at 804–05. And so for example, if a school opens its mailboxes to a union based on its status as the exclusive bargaining unit of the teachers, and not based on its viewpoint, it has not created a public forum and is not constitutionally obliged to allow access to any organization which wishes to have it. *Perry*, 460

U.S. at 48–51. And when the federal government opened its Combined Federal Campaign to allow non-profits to receive charitable donations from federal employees it did not create a public forum merely by allowing approximately 237 organizations (out of approximately 850,000 tax-exempt charities) to participate in the program. *Cornelius*, 473 U.S. at 804–05. "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Id.* at 806.

The plaintiffs in this case want to attend a limited-access press conference—an event that is not open to the public and not held on government property dedicated to open communication. *See Perry*, 460 U.S. at 45–46. These limited-access press conferences are open only to journalists who meet the content-neutral criteria, and then, only the limited number of reporters who can be accommodated after taking into account space constraints and security concerns. MacIver wants access to a non-public forum—one to which the government may regulate access provided the regulations are reasonable and "not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* at 46. The Governor's "decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808.[1]

---

[1] The Governor asserts that the standard applicable to non-public fora is the most demanding one that might apply and suggests that, in fact, the Governor's press events could be classified as either a proprietary function or government speech to which only rational basis review applies. We think the non-public forum analysis is the appropriate one as applied to

We find that the Governor's media-access criteria are indeed reasonable and not an effort to suppress MacIver's expression because of its viewpoint. The Governor contends that its criteria are intended to consider limited space constraints, address security concerns, and ensure that those in attendance will maximize the public's access to newsworthy information, and be more likely to abide by professional journalistic standards such as honoring embargoes and off-the-record communications. The resulting list of qualified media personnel includes a wide variety of news organizations and journalists from across the state and nation. The first three of the criteria listed in the memorandum are reasonably related to the viewpoint-neutral goal of increasing the journalistic impact of the Governor's messages by including media that focus primarily on news dissemination, have some longevity in the business, and possess the ability to craft newsworthy stories. The list prioritizes access by journalists whose reporting will reach wider audiences, while also allowing room for smaller media outlets (such as tribal publications). The criteria listed in numbers four and five of the memorandum are reasonably related to the viewpoint-neutral goal of increasing journalistic integrity by favoring media that avoid real or perceived conflicts of interest or entanglement with special interest groups, or those that engage in advocacy or lobbying. Similar standards are also used by other governmental bodies such as the United States Congress. There is nothing inherently viewpoint-based about these criteria, and MacIver has not provided any evidence that the Governor's office

---

the facts of this case involving an invitation-only, limited-access press event.

manipulates these neutral criteria in a manner that discriminates against conservative media.

In its fact section, MacIver asserts that it viewed the media advisory list as confirmation that its exclusion was ideologically motivated, but it offers no support or explanation for that factual assertion. In fact, the list includes media outlets traditionally viewed as conservative leaning such as the Washington Times, Wall Street Journal, Fox News, and Washington Examiner, as well as those viewed as liberal leaning such as the Capitol Times, New York Times, and Huffington Post. MacIver argues that the list of included conservative media outlets is not relevant as they are national outfits with limited local presence and unlikely to cover the Governor's events, but the inclusion of a broad range of media outlets on both sides of the political spectrum certainly diminishes any claim that the list is based on political ideology. Moreover, Wisconsin politics and policy are frequently the subject of national news media, as we saw during the 2020 elections.

MacIver has not provided sufficient factual support in the record demonstrating that the Governor discriminated against MacIver on the basis of its viewpoint, rather than for the stated reason that "their practices ran afoul of the neutral factors." R. 15 at 6. MacIver does not point to any other local conservative media that meet the access criteria but were excluded. In fact, the Governor's office also excluded the Wisconsin Policy Forum, a liberal think tank, from the media list. MacIver attempts to distinguish itself from the Wisconsin Policy Forum, but fails to offer any record evidence. The Governor's office determined that the MacIver News Service made "no effort to distinguish itself from the overall organization mission" of the MacIver think tank which promotes free

markets, individual freedom, personal liberty, and limited government. R. 15 at 6. There is no evidence in the record, for example, to support the claim that MacIver's News Service is actually, rather than merely nominally, separate from the MacIver Institute. Pointing the court to structural differences on its website along with other non-record evidence and evidence gleaned from the internet does not suffice. MacIver's other naked assertions of bias are also unsupported by references to the record. District courts cannot make rulings on summary judgment based on evidence not in the record. *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011). Moreover, the district court found that none of MacIver's comparisons were apt, and we find no reason to disturb the district court's more specific fact findings about these comparisons. D. Ct. Op. at 15–18, R. 30 at 15–18.

MacIver disagrees not just with this outcome, but with the use of forum analysis at all. Forum analysis, it argues, is a "freedom of speech doctrine, governing when a private speaker has a right to speak on government property." MacIver Brief at 9. Instead, it proposes that the court apply the highest level of scrutiny to MacIver's exclusion because the MacIver reporters are protected under the freedom of press clause of the First Amendment. But forum analysis is not merely about who has the right to speak on government property. It also addresses who has the right of access to government property to engage in various expressive pursuits— whether that expressive pursuit is leafletting teachers, soliciting charitable donations, wearing political buttons at a polling place, or gathering information for news dissemination. *See, e.g.*, *Perry*, 460 U.S. at 40–41; *Cornelius*, 473 U.S. at 797; *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). After all, all of these are forms of expressive activity. And the

amount of access and freedom that the government must give to someone in pursuit of an expressive activity depends on the forum (and also the time and manner).

MacIver's proposed "equal access" framework is really an argument that any restriction on someone acting as a member of the press must be subject to strict scrutiny. And this argument fails for several reasons, but the first is that reporters are not cloaked with automatic "strict scrutiny protection" merely because they are members of the press. "The First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972); *see also Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 946 (7th Cir. 2015) ("the First Amendment provides no special solicitude for members of the press."). "The right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). Neither the First Amendment nor the Fourteenth Amendment grants the media a "special right of access to [governmental buildings or information] different from or greater than that accorded the public generally." *Houchins v. KQED, Inc.*, 438 U.S. 1, 16 (1978). Members of the press are routinely excluded from places that other members of the public may not access such as grand jury proceedings, Supreme Court and appellate court conferences, the meetings of other official bodies gathered in executive session, the meetings of private organizations, and non-public crime scenes, among others. *See Branzburg*, 408 U.S. at 684–85. We can imagine the havoc that might ensue if government entities could not exclude members of the press from any non-public part of a government building—private offices, meeting rooms, government laboratories—without demonstrating

that the restriction is necessary to serve a compelling interest and narrowly drawn to meet that interest.

MacIver's argument that the First Amendment provides a guarantee of "equal access" among members of the media rests on cases that pre-date modern forum analysis or cases with such unique facts as to have no relevance here. It is true that the Second Circuit in 1977 stated that "once there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable." *Am. Broad. Companies, Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977). But in that case a mayoral campaign blocked access to one of three major networks that existed at the time, ABC, while allowing the other two, NBC and CBS. (The lack of access resulted from a labor dispute). It was the resulting inequity between the three equal networks that the court sought to remedy, and thus it explained, "[i]n the event that CBS and NBC refuse to either cross the picket line or have their managerial crew operate, then the injunction will not be operative because that would result only in ABC getting what we might call in the vernacular a 'scoop' which is not our intention. In other words, we want the networks to be on a par … ." *Id.* at 1084. In addition to pre-dating *Perry* and *Cornelius*, the facts of the *ABC* case are too far afield. In the *ABC* case, one of three undisputedly equivalent broadcasting companies was excluded from coverage without any neutral criteria guiding the decision to exclude it. *Id.* at 1083–84. Likewise, *Sherrill v. Knight*, also predates modern forum analysis, but in any event articulates what we already know: a government cannot deny a press pass to an individual reporter based on an alleged but unarticulated vague security concern where there are no established neutral criteria for

granting security access. *Sherill v. Knight*, 569 F.2d 124, 130 (D.C. Cir. 1977). The post-*Perry* cases MacIver cites are just too far off the mark factually to be of any help to MacIver. In *Anderson*, a court issued a protective order that prohibited the dissemination of all information in a pending case to all media outlets save for one given exclusive access. *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 9 (1st Cir. 1986). And in the *Huminski* case, the court faced the difficult challenge of balancing First Amendment access to the courtroom by a self-titled "citizen reporter" who sparked security concerns by parking a van in the courthouse parking lot with posters containing veiled threats to a judge. *Huminski v. Corsones*, 386 F.3d 116, 122–28 (2d Cir. 2004), *as amended on reh'g*, 396 F.3d 53 (2d Cir. 2005). We could continue distinguishing these cases, but none of these out-dated, or out-of-context (or out-of-circuit) cases provide any help.

MacIver implores us to look to *Minneapolis Star Tribune* and *Arkansas Writer's Project* as two cases that it argues forbid the state from distinguishing between members of the press. *Minn. Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983); *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987). But these cases reinforce the Governor's argument by concluding that states can subject the press to generally applicable regulations without offending the First Amendment. *Minn. Star & Trib.*, 460 U.S. at 581 ("It is beyond dispute that the States and the Federal Government can subject newspapers to generally applicable economic regulations without creating constitutional problems."); *Ark. Writers' Project*, 481 U.S. at 228 (same). The burden imposed on the press in *Minneapolis Star Tribune*, was not a generally applicable regulation, but rather a tax which singled out the press over other industrial producers by taxing ink and paper but not other

industrial component products. *Id.* at 584, 591. In *Arkansas Writer's Project*, it was a tax exemption based on the content of the written media. *Ark. Writers' Project, Inc.*, 481 U.S. at 229. In short, the court applied strict scrutiny, not simply because the plaintiffs were members of a free press, but because the press in those cases were being subject to differential treatment, and in the case of the *Arkansas Writers' Project*, differential treatment based on content. Here, a rule of general application applies to MacIver: in situations where the state does not open its governmental property to the general public, those who wish to attend functions in state facilities must be invited based on reasonable and content-neutral criteria. Because the state has not imposed a content-based approach to the burden, or singled out the press over other industries for differential treatment, strict scrutiny is not the appropriate filter with which to evaluate these regulations.

At the end of the day, we can conclude that, when we look at expressive activities—whether pure speech, press, or assembly—location matters. In scrutinizing restrictions to the other enumerated expressive right, the right to assembly, the Supreme Court has explained that "to ascertain what limits, if any, may be placed on protected speech, we have often focused on the 'place' of that speech, considering the nature of the forum the speaker seeks to employ." *Frisby v. Schultz*, 487 U.S. 474, 479 (1988) (upholding local ordinance prohibiting protesting in front of an individual's residence). This is why protests—one of the most protected forms of First Amendment rights—can be barred from the floor of the United States Capitol chambers but yet protected on the lawn outside. In short, even for the most protected of First Amendment activities, forum matters.

Because of MacIver's theory that all press deserve "equal access to events and information made generally available to the press corps," (MacIver Brief at 11), MacIver expends many words extolling the credentials, professionalism, and skills of its two "award-winning" reporters, Osmulski and Kittle. This is not an argument that MacIver raised below, and therefore we need not consider it. It is worth emphasizing, however, that First Amendment rights do not turn on, nor are they calibrated to, the quality of the reporting. Imagine a system where the government doled out the freedom of press based on a government official's assessment of the quality of the reporting or the credentials of the reporters. *See Lund v. City of Rockford, Illinois*, 956 F.3d 938, 941 n.1 (7th Cir. 2020) ("We note that First Amendment protection does not depend on the quality of the news source or the wages of the reporter."). The protections of the First Amendment extend not just to the traditional press embodied by newspapers, television, books, and magazines, "but also humble leaflets and circulars," which were meant to play an important role in the discussion of public affairs. *Mills v. State of Ala.*, 384 U.S. 214, 219 (1966). Protecting the right of small, upstart, and non-objective media producers, however, does not mean that the Governor of Wisconsin must grant every media outlet access to every press conference. We cannot fathom the chaos that might ensue if every gubernatorial press event had to be open to any "qualified" journalist with only the most narrowly drawn restrictions on who might be excluded. And no one's needs would be served if the government were required to allow access to everyone or no one at all.

MacIver appears to have abandoned its equal-protection claim. Although MacIver's Statement of the Issues asserts that its "equal access" among members of press argument is

rooted in both the First Amendment and the Fourteenth Amendment's equal-protection clause, MacIver does not develop this argument other than listing a string cite of cases of out-of-circuit, 35-to-70-year-old cases in which the court placed the right to access by press in the equal-protection clause. We find that MacIver has waived its equal-protection argument, which, in any event, it describes as "coterminous" with its First Amendment claim. MacIver Reply Brief at 3, n.1. A party who does not sufficiently develop an issue or argument forfeits it. *Scheidler v. Indiana*, 914 F.3d 535, 540 (7th Cir. 2019).

In closing, it is worth reiterating the importance that this court and the Supreme Court have placed on newsgathering and its fundamental role in allowing citizens "to see, examine, and be informed of their government," not just for its own sake but so as to enable citizens to form their own judgments on matters of public concern and choose qualified representatives. *Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 599–600 (7th Cir. 2012). "The press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills*, 384 U.S. at 219. We therefore look carefully at any claim that a government entity is disallowing access to the media or a particular subset thereof. This does not mean, however, that members of the press have special access to newsgathering and must be exempt from laws and rules of general application. *ACLU*, 679 F.3d at 598. Nor does it mean that we must disallow a government's set of viewpoint-neutral criteria simply because we can imagine a superior system of allocation. The Governor's office has created neutral laws of general

application and MacIver has not shown any evidence that it was excluded based on its viewpoint. As a result, the district court's grant of summary judgment for the Governor must be AFFIRMED.