# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 31, 2022        Decided August 23, 2022

No. 21-5073

GORDON M. PRICE,
APPELLEE

v.

MERRICK B. GARLAND, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA, ET
AL.,
APPELLANTS

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-03672)

---

*Joseph F. Busa*, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Brian M. Boynton*, Acting Assistant Attorney General, *Michael S. Raab* and *Joshua M. Salzman*, Attorneys.

*Robert Corn-Revere* argued the cause for appellee. With him on the brief was *Patrick J. Curran Jr.*

*Glenn E. Roper* was on the brief for *amici curiae* Pacific Legal Foundation and Anthony Barilla in support of appellee.

*Mickey H. Osterreicher* and *Alicia Wagner Calzada* were on the brief for *amici curiae* National Press Photographers Association, et al. in support of appellee.

Before: HENDERSON and TATEL[*], *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

Concurring opinion filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Circuit Judge* TATEL.

GINSBURG, *Senior Circuit Judge*: Gordon Price is an independent filmmaker. He filmed parts of a feature film on land administered by the National Park Service (NPS) without having obtained the requisite permit and having paid the requisite fee. The Government charged him with a misdemeanor but later dismissed the charge. Price then sued for declaratory and injunctive relief, arguing the permit-and-fee requirements are facially unconstitutional under the First Amendment to the Constitution of the United States. The district court agreed with Price, holding the permit-and-fee requirements do not satisfy the heightened scrutiny applicable to restrictions on speech in a public forum.

We hold that regulation of filmmaking on government-controlled property is subject only to a "reasonableness" standard, even when the filmmaking is conducted in a public

---

[*] Judge Tatel assumed senior status after this case was argued and before the date of this opinion.

forum. Because the permit-and-fee requirements are reasonable, we reverse the order of the district court.

## I. Background

### A. Statutory and Regulatory Framework

By statute, the Secretary of the Interior must "require a permit and . . . establish a reasonable fee for commercial filming activities" on land administered by the NPS. 54 U.S.C. § 100905(a)(1). In keeping with this mandate, the implementing regulations state that "[a]ll commercial filming requires a permit," and that the NPS "will require a reasonable location fee . . . assess[ed] . . . in accordance with a fee schedule . . . publish[ed] in the Federal Register." 43 C.F.R. §§ 5.2(a), 5.8(a)(1),(3). The regulations go on to define "commercial filming" as "the film, electronic, magnetic, digital, or other recording of a moving image by a person, business, or other entity for a market audience with the intent of generating income." *Id.* § 5.12. Although some news gathering activities fit within this definition, the regulations generally exempt news gathering from these requirements. *Id.* § 5.4.

The regulations also specify that a permit will be denied if, among other reasons, it is likely an activity would: "(a) Cause resource damage; (b) [u]nreasonably disrupt or conflict with the public's use and enjoyment of the site; (c) [p]ose health or safety risks to the public; [or] (d) [r]esult in unacceptable impacts or impairment to National Park Service resources or values." 43 C.F.R. § 5.5.

The location fee, which must be calculated to "provide a fair return to the United States," is to be based upon "the number of days of the filming activity," "the size of the crew,"

"the amount and type of equipment present," and any "other factors . . . the Secretary considers necessary." 54 U.S.C. § 100905(a)(1)-(2). In addition to the location fee, the Secretary must recover "any costs incurred as a result of filming activities." *Id.* 100905(b). A person convicted of engaging in commercial filming without obtaining a permit or paying a fee faces a fine and up to six months in prison. *See* 18 U.S.C. § 1865; 36 C.F.R. § 1.3, 5.5(a).

These regulations are consistent with others that apply to various types of commercial activity conducted on land administered by the NPS. For instance, it is generally prohibited to "engag[e] in or solicit[] any business in park areas, except in accordance with the provisions of a permit, contract, or other written agreement with the United States." 36 C.F.R. § 5.3. Similarly, a concessionaire must contract with the Government and pay a "franchise fee." 54 U.S.C. § 101913. Finally, a person who wishes to provide services to visitors on NPS land must obtain authorization and pay "a reasonable fee for issuance of a commercial use authorization." 54 U.S.C. § 101925(a)(2)(A).

All these regulations are consistent with and implement the Congress's declaration "that it is the policy of the United States that the United States receive fair market value of the use of the public lands and their resources." 43 U.S.C. § 1701(a)(9). They are also consistent with the Congress's delegation of authority to "[t]he head of each agency" to "prescribe regulations establishing the charge for a service or thing of value provided by the agency," 31 U.S.C. § 9701(b), because "[i]t is the sense of Congress that each service or thing of value provided by an agency . . . to a person . . . is to be self-sustaining to the extent possible," *id.* § 9701(a).

## B.  Facts

The following facts are taken from the district court's memorandum opinion.  Plaintiff-Appellee Gordon Price is a part-time independent filmmaker.   In 2018 he released *Crawford Road*, a film about a stretch of road in York County, Virginia that was the location of unsolved murders and long rumored to be haunted.  Price filmed scenes on the Yorktown Battlefield in the Colonial National Historical Park, land administered by the NPS, without first obtaining a permit from the NPS and paying the fee.  For those scenes, Price used a camera, a tripod, and a microphone.  A crew of no more than four people were present.

*Crawford Road* premiered in October 2018 to an audience of around 250 people in Newport News, Virginia.  A couple of months later, NPS officers issued Price a "violation notice" for failing to obtain a commercial filming permit.

In the wake of the criminal charge, Price canceled further screenings of *Crawford Road* and removed from it all footage shot on NPS land.  Discussions about a distribution deal for the film came to an abrupt halt.  Price had also been doing preliminary work on another film that would involve filming on land administered by the NPS, but he refrained from shooting this footage out of fear of prosecution.

Appearing before the United States District Court for the Eastern District of Virginia, Price moved to dismiss the charge, on the ground that § 100905 and its implementing regulations are facially unconstitutional.  Instead of litigating this question, the Government dismissed the charge.  Deprived of jurisdiction to consider the merits of Price's constitutional challenge, which were raised only as a defense to a criminal prosecution,

the district judge dismissed the case. The Government did not, however, renounce its belief in the constitutionality of the statute and the regulations, nor did it forswear prosecution of Price for any future violation of the permit-and fee-requirements.

In December 2019 Price pressed his constitutional argument in a civil complaint filed in the United States District Court for the District of Columbia. Price sued several individuals in their official capacities: the Attorney General of the United States of America, the Secretary of the Department of the Interior, and the Deputy Director Exercising the Authority of Director of the NPS. Alleging that § 100905 and the regulations implementing it are facially unconstitutional, Price sought declaratory and injunctive relief.

The parties cross-moved for judgment on the pleadings. The district court denied the defendants' motion and granted Price's.

In the memorandum opinion accompanying her order, the district judge treated the permit-and fee-requirements as content-based regulations of speech and determined that they do not withstand heightened (intermediate or strict) scrutiny. *Price v. Barr*, 514 F. Supp. 3d 171, 187-93 (D.D.C. 2021). She therefore concluded the requirements unconstitutionally restrict speech on land administered by the NPS that "courts have already identified as traditional public forums " (e.g., the National Mall and sidewalks outside the Vietnam Veterans Memorial) or that the NPS has designated as forums for certain first amendment activities, namely, demonstrations and the distribution of message-bearing items, *see* 36 C.F.R. §§ 2.51-2.52. 514 F. Supp. 3d at 187. Although Price did not film on park land that is a public forum and therefore had no basis to challenge the permit-and-fee regime as applied to him, the

district judge concluded that the regime was unconstitutional on its face because it "burdens substantially more speech than is necessary to achieve the government's substantial interests." *Id.* at 193 (cleaned up).

In dispensing "the strong medicine of overbreadth invalidation," *Virginia v. Hicks*, 539 U.S. 113, 120 (2003) (cleaned up), the district judge relied primarily upon our decision in *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508 (2010), which she deemed sufficiently analogous to "provide[] considerable support for Mr. Price's argument." 514 F. Supp. 3d. at 190. The district judge did not, however, specifically wrestle with the "proportionality aspect of [the] overbreadth doctrine," *Hicks*, 539 U.S. at 122 n.3; that is, despite the vast areas of NPS land that are not public forums, her "opinion contains *no* 'comparing' of valid and invalid applications *whatever*," *id.*, to demonstrate that the overbreadth is "substantial not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications," *id.* at 120 (cleaned up).

Having concluded that the permit-and-fee requirements are facially unconstitutional, the district judge granted Price's request for declaratory relief and issued a nationwide injunction barring enforcement of the permit-and-fee requirements.

## II.    Analysis

"[W]e review de novo the district court's ruling on the motion for judgment on the pleadings." *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 9 (D.C. Cir. 2009). The Government does not dispute that Price has standing to pursue his claims. That, of course, does not relieve us of our obligation to determine whether we have jurisdiction. To that end, we agree with the

district judge that Price "has presented a sufficiently credible statement of his intention to conduct commercial filming within a national park," thereby implicating a constitutional interest, 514 F. Supp. 3d at 182 (cleaned up), and "has also established that his proposed filmmaking creates a credible threat of prosecution," *id.* at 183 (cleaned up); *see Woodhull Freedom Found. v. United States*, 948 F.3d 363, 370 (D.C. Cir. 2020). That the NPS has issued interim guidance complying with the district court's decision certainly does not make the case moot because, as the NPS has stated, it "intends to update regulations addressing filming activities that are consistent with the outcome of [this litigation]." NPS, *Filming and Still Photography Permits*, https://www.nps.gov/aboutus/news/commercial-film-and-photo-permits.htm (Aug. 26, 2021). *See W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2607 (2022). ("Voluntary cessation does not moot a case unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" (cleaned up)).

## A. The Applicability of Forum Analysis

Filmmaking undoubtedly is protected by the First Amendment. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment."). This uncontroverted fact, however, merely launches our inquiry, for "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985). Because "the Government, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated, the Court has adopted a forum analysis" to determine the legality of

restrictions upon speech on Government property. *Id.* at 800 (cleaned up).

For the purposes of this analysis, Government property is generally divided into three categories: traditional public forums, designated public forums, and nonpublic forums.

A traditional public forum is property that has "time out of mind" been used to assemble and to communicate with others. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO,* 307 U.S. 496, 515 (1939)). Examples include public streets and city parks. *Id.* Government regulation of speech on this type of property is subject to the same heightened scrutiny as applies to regulation of speech on property not controlled by the Government: strict scrutiny if the regulation is content-based, intermediate scrutiny if it is content-neutral. *See id.*

A designated public forum is "government property that has not traditionally been regarded as a public forum," but the Government has "intentionally opened up for that purpose." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009). Examples include meeting facilities maintained by state universities and municipal theaters. *Perry*, 460 U.S. at 45. So long as the government chooses to "retain the open character" of the property, "it is bound by the same standards as apply in a traditional public forum." *Id.* at 46.

A nonpublic forum is government property that "is not by tradition or designation a forum for public communication," *id.;* examples are museums and offices. There, the Government has far more leeway to regulate speech: a restriction of speech in a nonpublic forum is "examined only for reasonableness," *United States v. Kokinda*, 497 U.S. 720, 726 (1990). This means the restriction is constitutional if it is

reasonable given "the purpose of the forum and all the surrounding circumstances," *Cornelius*, 473 U.S. at 809, and is viewpoint neutral, *id.* at 806.

A hybrid case is the limited public forum, in which the Government has "create[d] a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Summum*, 555 U.S. at 470. Those limitations, like restrictions in a nonpublic forum, need only be reasonable and viewpoint neutral. *Good News Club v. Milford Central Sch.*, 533 U.S. 98, 106 (2001).

The district court's conclusion that the permit-and-fee requirements for filming on NPS property are unconstitutional is based upon its assumption that the speech-protective standards of a public forum apply to filmmaking just as they apply to other speech. This assumption flows from a simple, initially attractive syllogism:

- **Major premise:** All the details of forum analysis, including the speech-protective rules of a public forum, apply to any speech the First Amendment protects.

- **Minor premise:** The First Amendment protects filmmaking.

- **Conclusion:** All the details of forum analysis, including the speech-protective rules of a public forum, apply to filmmaking.

This syllogism also undergirds Price's argument in defense of the district court's decision.

The United States argues that the syllogism proceeds from a flawed major premise because not every activity the First Amendment protects as speech benefits from the strict, speech-protective rules of a public forum. Because a filmmaker does not seek to communicate with others at the location in which he or she films, the filmmaker does not use the location as a "forum." Therefore, the United States argues, the district court's forum analysis was misplaced. Price counters that the district judge had it right: There is no basis to distinguish between filmmaking and other activities protected by the First Amendment.

We think the Government is correct. Based upon the historical underpinnings of forum analysis, the evolution of this analytical framework, and the cases in which the Supreme Court has applied it, we are convinced that it would be a category error to apply the speech-protective rules of a public forum to regulation of an activity that involves merely a noncommunicative step in the production of speech. Although that activity warrants solicitude under the First Amendment, that solicitude does not come from the speech-protective rules of a public forum. In reaching this conclusion we are buoyed by the Supreme Court's warning against extending the public forum doctrine "in a mechanical way" to contexts that meaningfully differ from those in which the doctrine has traditionally been applied. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672-73 (1998).

We begin by examining the history of forum analysis and how the Supreme Court has described and justified it. Modern forum analysis came to fruition in the 1983 case of *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, but its seed had been planted decades earlier. Although the earlier cases do not present a fully developed forum doctrine, they are widely cited for their descriptions of the types of

government-controlled property that are subject to special rules under the First Amendment. In *Hague v. CIO*, for instance, the Court had stated:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used *for purposes of assembly, communicating thoughts between citizens, and discussing public questions*. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

307 U.S. 496, 515 (1939) (emphasis added). Similarly, in *Schneider v. State of New Jersey*, *Town of Irvington*, the Court had said that "the streets are natural and proper places *for the dissemination of information and opinion*." 308 U.S. 147, 163 (1939) (emphasis added). Soon thereafter, in *Cox v. State of New Hampshire*, the Court summarized the relevant case law as follows:

> As regulation of the use of the streets for parades and processions is a traditional exercise of control by local government, the question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge *the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places*.

312 U.S. 569, 574 (1941) (emphasis added).

In the 1970s, the Court began using the term "public forum" to denote government-controlled property on which the Government would have to tread far more lightly in regulating speech. *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555 (1975) (describing municipal theaters as "public forums designed for and dedicated to expressive activities"); *Greer v. Spock*, 424 U.S. 828, 838 (1976) (declaring that "the business of a military installation" is "to train soldiers, not to provide a public forum").

*Perry* was the culmination of this doctrinal evolution. There, the Court delineated the contours of forum analysis as we know it. It quoted the above passage from *Hague* and relied upon other proto-forum-analysis cases to announce that "[i]n places which by long tradition or by government fiat have been *devoted to assembly and debate*, the rights of the state to limit expressive activity are sharply circumscribed." 460 U.S. at 45 (emphasis added).

Two related commonalities run through the cases from *Hague* to *Perry*: the types of activities associated with public forums and the proffered justification for affording special protection to those activities in a public forum. As for the types of activities, the cases are concerned with assembly, the exchange of ideas to and among citizens, the discussion of public issues, the dissemination of information and opinion, and debate — all of which are communicative activities. It should come as no surprise, therefore, that the Court in *Perry* described the rule for a traditional public forum as follows: "In these quintessential public forums, the government may not prohibit all *communicative* activity." *Id.* (emphasis added).

The emphasis on communicative activities makes perfect sense considering the second commonality in the foundational cases: basing the justification for heightened protection of

communicative activities in traditional public forums on their having "immemorially been held in trust" for that activity, and on participation in that activity being a privilege the public has enjoyed "time out of mind." *Hague*, 307 U.S. at 515. As explained by the most eloquent Professor Harry Kalven, Jr., this longstanding use of public forums provides the public with an "easement" on this type of property. *The Concept of the Public Forum: Cox v. Louisiana*, 1965 Sup. Ct. Rev. 1, 13 (1965). It follows, as the Supreme Court has demonstrated, that to determine whether the highly speech-protective rules of a public forum apply to a given property, the question for a court is whether there is "a traditional right of access . . . comparable to that recognized for public streets and parks." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 814 (1984).

Unsurprisingly, every single Supreme Court case from *Perry* onward in which the application of forum analysis was at issue involved communicative activity. *See, e.g., Perry*, 460 U.S. at 37 (interschool mail system); *Taxpayers for Vincent*, 466 U.S. at 789 (lampposts used to hang signs); *Cornelius*, 473 U.S. at 801) (access to government-created charity drive conducted in federal workplaces during working hours); *Forbes*, 523 U.S. at 666 (1998) (debate among political candidates broadcast on public television stations). This buttresses our conclusion that forum analysis applies only to communicative activities, not to activities that, even if generally protected by the First Amendment, are not communicative.

Though protected as speech under the First Amendment, filmmaking, like typing a manuscript, is not itself a communicative activity; it is merely a step in the creation of speech that will be communicated at some other time, usually in some other location. Creation of speech is not the type of

activity for which streets and parks have been used "time out of mind," and therefore it cannot be said that they have "immemorially been held in trust" for such activity. There is no historical right of access to government property in order to create speech.

Price argues our distinction between communicative activity and filmmaking contradicts the consensus of the courts of appeals: "Every circuit court to address the issue," he says, "has held that the First Amendment protects the right to make audio and/or video recordings in public places."

The cases Price cites do not establish a general right to create recordings in public places. Save for one, those cases deal with the filming of a public official (usually a police officer) performing public duties on public property. *See Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 832 (1st Cir. 2020); *Fields v. City of Phila.*, 862 F.3d 353, 355-56 (3d Cir. 2017); *Turner v. Driver*, 848 F.3d 678, 687-88 (5th Cir. 2017); *Gericke v. Begin*, 753 F.3d 1, 7-8 (1st Cir. 2014); *Alvarez*, 679 F.3d at 595-97; *Glik v. Cunniffe*, 655 F.3d 78, 82-83 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000).

Filming a public official performing public duties on public property implicates unique first amendment interests. "Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.'" *Glik*, 655 F.3d at 82 (quoting *Mills v. Alabama,* 384 U.S. 214, 218 (1966)). It should come as no surprise, therefore, that these cases do not speak of a sweeping right to record in public, but of a narrower right "to gather information about what public officials do on public property." *Smith*, 212 F.3d at 1333.

We understand these cases as standing for the proposition that it is unreasonable to issue a blanket prohibition against the recording of a public official performing public duties on public property, so long as the recording does not interfere with the performance of the official's duties. "Such peaceful recording of [the performance of a public duty] in a public space . . . is not reasonably subject to limitation." *Glik*, 655 F.3d at 84. This helps explain why these cases make no effort to determine whether the location of the recording is a public forum: Because prohibiting the recording of a public official performing a public duty on public property is unreasonable, the specific nature of the public property is irrelevant.

Of the cases cited by Price, the only one that reaches beyond the recording of a public official on public property is *Ness v. City of Bloomington*, 11 F.4th 914 (8th Cir. 2021). The court in that case concluded that a city ordinance banning the video recording of a child without the consent of the child's guardian was unconstitutional as applied to a person who wished to record alleged violations of a permit issued to a youth center by the city. *Id.* at 918. As the court noted, however, the plaintiff's video recordings were "of matters of public controversy" for dissemination to the public, which the court likened to "news gathering." *Id.* at 923. Even that case, therefore, does not suggest a general right to record on public property.[*]

---

[*] The same goes for *John K. MacIver Institute for Public Policy, Inc. v. Evers*, 994 F.3d 602 (7th Cir. 2021), invoked by our dissenting colleague as support for his contrary position. That case, which does not even deal with filming, holds merely that forum analysis applies to "gathering information for *news* dissemination." *Id.* at 612 (emphasis added).

Although the *Ness* court proceeded to apply traditional forum analysis in concluding that the ordinance was unconstitutional, *id.*, its analysis does not resolve the key question here. After noting that "video recording is speech," the court merely assumed forum analysis should apply; it did not grapple with the differences between communicative activity and video recordings. *Id.* As we have explained, extending traditional forum analysis in this manner ignores the analytical underpinnings of forum analysis.[*]

## B. Reasonableness

Price asserts that the regulation of filmmaking is subject to heightened scrutiny when the filming takes place on NPS land considered a traditional public forum or on land designated by the NPS as a free speech area. But the key takeaway from the preceding analysis is that, with respect to noncommunicative first amendment activity such as filmmaking, the highly-protective rules of a traditional public forum are inapplicable. As a result, filmmaking is subject to the same degree of regulation in a traditional public forum as it would be in a nonpublic forum. The same surely applies to filmmaking in the designated free speech areas the district judge identified as other NPS land in which heightened scrutiny ought to apply. 514 F. Supp. 3d at 187. Those areas are limited public forums, which the Government has opened specifically for "demonstrations" and the sale or distribution of message-bearing items, *see* 36 C.F.R. § 2.52-2.53, but not for noncommunicative first amendment activity such as

---

[*] Our conclusion about the applicability of forum analysis to filmmaking is based upon the difference between communicative activity and steps in the creation of speech. Forum analysis may well apply to live streaming, which is communicative activity, albeit to people who are not necessarily located in the forum in which the streaming is conducted.

filmmaking. For that type of activity, these areas are effectively nonpublic forums.

The upshot is that filmmaking on all NPS land is subject to the same "reasonableness" standard that applies to restrictions on first amendment activity in a nonpublic forum: The "restriction must not discriminate against speech on the basis of viewpoint, and the restriction must be reasonable in light of the purpose served by the forum," *Good News Club*, 533 U.S. at 106-07 (cleaned up).

It follows that *Boardley* (upon which the district judge and Price rely) has nothing to do with this case. That case dealt with the distribution of written materials, 615 F.3d at 512, a communicative activity to which the heightened speech-protective rules of a public forum undoubtedly apply. Here, by contrast, we must assess the permit-and-fee requirements under the aforementioned "reasonableness" standard.

As several of our sister circuits have recognized, "reasonableness" requires something more than the toothless "rational basis" test used to review the typical exercise of a state's police power. *See NAACP v. City of Phila.*, 834 F.3d 435, 443-44 (3d Cir. 2016); *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 966–67 (9th Cir. 2002); *Multimedia Pub. Co. of S.C. v. Greenville–Spartanburg Airport Dist.*, 991 F.2d 154, 159 (4th Cir. 1993). At the same time, "[r]easonableness is a relatively low bar," *NAACP*, 834 F.3d at 443, so regulations subject to this standard are subject "must survive only a much more limited review" than are regulations subject to heightened (intermediate or strict) scrutiny, *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992). Moreover, a reasonable regulation "need not be the most reasonable or the only reasonable limitation," *Cornelius*, 473 U.S. at 808. Indeed, "there is no requirement . . . 'that the

restriction be narrowly tailored' to advance the government's interests." *Hodge v. Talkin*, 799 F.3d 1145, 1164–65 (D.C. Cir. 2015) (quoting *Cornelius*, 473 U.S. at 809). Crucially, the "reasonableness" of any restriction "must be assessed in the light of the purpose of the forum and all the surrounding circumstances. " *Cornelius*, 473 U.S. at 806, 809. And, finally, "reasonableness" may be established by evidence in the record or even by a commonsense inference. *See NAACP*, 834 F.3d at 443-44 (summarizing relevant Supreme Court precedent).

No party argues (nor could they) that the permit-and-fee requirements discriminate based upon viewpoint. Therefore, we need assess only whether those requirements are reasonable.

The Government argues the permit-and-fee regime furthers two significant interests: (a) raising revenue to maintain and improve the parks; and (b) ensuring that filming does not harm federal lands or otherwise interfere with park visitors' enjoyment of them. Price counters the revenue-raising justification, saying the district judge correctly concluded it runs afoul of the well-settled rule that the Government may not "impose a charge for the enjoyment of a right granted by the federal constitution," *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943).

Price further argues the permit requirement is unconstitutional because, insofar as it is justified as protecting park land, the distinction in the regulation between commercial and noncommercial filmmaking bears no relationship to that purported interest.

### 1. The fee requirement

We have no difficulty rejecting Price's contention that the location fee violates the *Murdock* rule. The fee is not an impermissible charge for engaging in constitutionally protected activity; it is reasonable extraction of a rent by the owner of a property. As the Eleventh Circuit has noted, "reasonableness, for purposes of forum analysis, includes a commercial component." *Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1309 (11th Cir. 2003). With respect to a nonpublic forum, "reasonable regulations may include profit-conscious fees for access for expressive conduct, in a manner similar to fees that would be charged if the forum was owned by a private party (i.e., a fee for an auditorium for a dance recital, or a fee for displaying advertisements in a newspaper)." *Id.* That is why a government agency may extract rent from a vendor that sells newspapers in a government-controlled airport or subway station. *See id.*; *Jacobson v. City of Rapid City*, 128 F.3d 660, 664 n.2 (8th Cir. 1997); *Gannett Satellite Info. Network, Inc. v. Metropolitan Transp. Auth.,* 745 F.2d 767, 775 (2d Cir. 1984) ("If Gannett were to place its newsracks on privately owned business property it undoubtedly would have to pay rent to the owner of the property. The fact that the business property in question is owned by the MTA should confer no special benefit on Gannett.").

Charging for commercial use of park land is no different. The Government has not singled out speech to charge a fee; as detailed above, it charges a fee for all types of commercial activity on land controlled by the NPS, which is consistent with the Congress's declaration "that it is the policy of the United States that the United States receive fair market value of the use of the public lands and their resources." 43 U.S.C.

§ 1701(a)(9). The fee requirement merely puts a commercial filmmaker on the same footing as any other person who uses park land for a commercial purpose, such as a concessionaire. Just as the Government may charge the concessionaire a rental fee, so too may it charge the commercial filmmaker a usage fee.

We do not suggest that any fee would be constitutionally permissible or that any as-applied challenge to the fee charged by the NPS would fail. We simply reject the district judge's categorical conclusion that "any attempt to justify § 100905's permitting regime on the basis of a governmental need to raise revenue is a dead end," 514 F. Supp. 3d at 190, and conclude that on the present record, there is no basis to say the fee requirement is unreasonable. Which brings us to the permit requirement.

## 2. The permit requirement

Protecting and properly managing park lands are undoubtedly significant governmental interests, *see Boardley*, 615 F.3d at 519. With regard to whether a small film crew with a small amount of equipment implicates those interests, we find illuminating the words of the NPS when it first adopted the regulation:

> While it could be assumed that crews of three people or fewer have less potential for causing resource damage or interfering with the public's use or enjoyment of the site, the agencies governed by this regulation manage and protect some of the nation's most treasured and valuable natural and cultural resources. In many circumstances it is important for land managers to know the specific time and location

of certain activities so permit terms and conditions may be used to mitigate the possibility of resource damage or impact to visitors. For example, park units may have limited space, fragile resources, or [may] experience high visitation during a specific time period. Refuges may need to protect nesting areas of threatened or endangered species during certain times of the year.

Commercial Filming and Similar Projects and Still Photography Activities, 78 Fed. Reg. 52,087, 52,090 (Aug. 22, 2013).

Price gives us no basis for second guessing the factual underpinnings of this rationale for requiring filmmakers to get a permit. What remains is his question about under-inclusiveness, for which he points to the disparate treatment of a small commercial production, for which a permit is required, and a larger non-commercial production, which is exempt from the permit requirement. Although Price raised the question to argue the permit requirement fails heightened scrutiny, his point is relevant, as far as it goes, even under the much less demanding standard of "reasonableness."

An argument that a restriction on speech is underinclusive faces an uphill battle, even when the restriction is subject to heightened scrutiny. Indeed, "it is surprising at first glance that a regulation of speech should ever be found impermissibly *underinclusive*," *ISKCON of Potomac, Inc. v. Kennedy*, 61 F.3d 949, 956 (D.C. Cir. 1995) (cleaned up), for, as the Supreme Court reminds us, "the First Amendment imposes not an 'underinclusiveness' limitation but a 'content discrimination' limitation upon a State's prohibition of proscribable speech*." R.A.V. v. City of St. Paul, Minn.*, 505

U.S. 377, 387 (1992). Thus, "an underinclusive . . . regulation that is otherwise valid must be found to be constitutional so long as it does not favor one side of an issue and its rationale is not undermined by its exemptions." *ISKCON*, 61 F.3d 957.

There can be no serious argument that the permit requirement favors one side of any issue. Nor does the distinction between commercial and non-commercial filming undermine the NPS's rationale for requiring a permit. As the Government points out, it stands to reason that "an expansive operation that generated no income would be rare compared to the common occurrence of large-scale commercial filming." It follows that a commercial film production is likely to involve more activities that are disruptive to park operations and are more likely to cause damage to park resources than does a non-commercial film production. Therefore, the distinction between commercial and non-commercial filming seems reasonably related to the Government's interests. While it may be that "these purposes would be more effectively and not so clumsily achieved" by drawing different distinctions, *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 297 (1984), that possibility does not make the line NPS has drawn unreasonable. Even if the question were a closer one, we would not have "the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained." *Id.* at 299.

As with the fee requirement, we have no occasion to foreclose the possibility of a successful as-applied challenge to the permit requirement. We hold only that, on the record before us, we cannot conclude the permit requirement is facially unreasonable.[*]

---

[*] Because we dispose of the case on this ground, we have no occasion to comment on (1) the propriety of the district court's

### 3. A brief rejoinder regarding the "news-gathering" exception

Price argues that the special treatment the NPS regulations afford to "news-gathering activities" amounts to an impermissible content-based distinction. He further argues that the distinction in the regulations between "news-gathering activities" (exempt from the permit-and-fee requirements) and filming a "documentary" (subject to the permit-and-fee requirements, 43 C.F.R. §§ 5.4, 5.12, is untenable and arbitrary.

Even if these arguments raised a real problem with a part of the regulations, they would not be grounds for facially invalidating the entire permit-and-fee regulation, much less the statute. In any event, the arguments are without merit. The favorable treatment of news-gathering is but an example of the unremarkable practice of the Congress "sometimes grant[ing] the press special privileges and immunities." *Associated Press v. F.C.C.*, 452 F.2d 1290, 1298 (D.C. Cir. 1971); *see also Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 579 (1977) (holding a state may privilege the press by exempting it from a right-of-publicity tort). Indeed, the exemption and the definition of "news-gathering activities" in the regulations are modeled on the Freedom of Information Act, which provides for a lower fee to be charged "a representative of the news media, 5 U.S.C. § 552(a)(4)(A)(i). Considering the centrality of the unimpeded functioning of the news media to the health

issuing a nationwide injunction or (2) whether the district court's overbreadth analysis, which pays little attention to proportionality, is consistent with our precedent and that of the Supreme Court, *see Hicks*, 539 U.S. at 122; *United States v. Williams*, 553 U.S. 285, 292-93 (2008); *Ass'n of Priv. Sector Colleges & Universities v. Duncan*, 681 F.3d 427, 456–57 (D.C. Cir. 2012).

25

of the Republic, an exception for "news-gathering" is certainly reasonable.

The distinction between news-gathering and filming a documentary is just as benign as the exemption for news-gathering. To the extent that a documentary is not "news," i.e., does not contain "information that is about current events or that would be of current interest to the public, gathered by news-media entities for dissemination to the public," 43 C.F.R. § 5.12, the distinction between filming a documentary and news-gathering is no different than the distinction between filming a drama and news-gathering. And to the extent the documentary is "news," it surely is included in the exception for "news-gathering."

## III.    Conclusion

To summarize, although filmmaking is protected by the First Amendment, the specific speech-protective rules of a public forum apply only to communicative activity. Consequently, regulations governing filmmaking on government-controlled property need only be "reasonable," which the permit-and-fee requirements for commercial filmmaking on NPS land surely are. We therefore reverse the grant of Price's motion for judgment on the pleadings and the denial of the defendants' motion for judgment on the pleadings; vacate the declaratory judgment and the permanent injunction entered by the district court; and remand the case to that court with instructions to deny Price's motion for judgment on the pleadings and to grant the defendants' motion for judgment on the pleadings.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring: Although I am in complete agreement with Judge Ginsburg's analysis and join it fully, I write separately only to emphasize the limited reach of the court's holding. We conclude that the regulation of most non-communicative speech on government property is subject to "reasonableness" review. Maj. Op. at 2, 16–17. We need not—and do not—explain the full contours of what does and does not constitute "communicative speech." Under Supreme Court precedent, "communicative" speech is that which "inten[ds] to convey a particularized message" in a manner that allows others to understand it. *Cf. Spence v. State of Wash.*, 418 U.S. 405, 410–11 (1974); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984) ("a message may be delivered by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative"). After today, we will still apply heightened scrutiny to a wide variety of speech. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995) (finding "protected expression" as varied as the "painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll"). Price's filmmaking presents a paradigmatic example of non-communicative speech, which is itself an oxymoronic term. As Judge Ginsburg explains, it "is merely *a step* in the creation of speech." Maj. Op. at 15 (emphasis added). Indeed, Price will still need to edit and show his film before "communicating" what he "inten[ds] to convey." *Spence*, 418 U.S. at 410–11.

TATEL, *Circuit Judge*, dissenting: Federal law prohibits anyone from engaging in "commercial filming activities" in the national parks without first obtaining a permit and paying a fee. 54 U.S.C. § 100905(a)(1). Even though our court recently struck down similar restrictions on speech in national parks as "overbroad" and "antithetical to . . . core First Amendment principle[s]," *Boardley v. United States Department of Interior*, 615 F.3d 508, 511 (D.C. Cir. 2010), the court today upholds these restrictions on grounds untethered from our court's precedent and that of our sister circuits. Because the permit and fee requirements penalize far more speech than necessary to advance the government's asserted interests, they run afoul of the First Amendment.

**I.**

Under 54 U.S.C. § 100905, any person who wishes to conduct "commercial filming activities" in any national park must obtain a permit and pay a fee. Designed solely to "provide a fair return to the United States," the fee is "in addition" to the government's recovery of all "costs incurred as a result of filming activities." *Id.* § 100905(a)–(b). Although the statute contains no definition of "commercial filming," the National Park Service's (NPS) implementing regulations define the term as any "recording of a moving image by a person, business, or other entity for a market audience with the intent of generating income." 43 C.F.R. § 5.12. Commercial filming includes "feature film, videography, television broadcast, [and] documentary," *id.*, but the term excludes "[n]ews-gathering activities." *Id.* § 5.4.

Appellee Gordon Price, without first obtaining a permit or paying a fee, used a single camera and microphone to film in Virginia's Colonial National Historical Park, intending to document rumored "hauntings and . . . unsolved murders" in the area. Compl. ¶¶ 37–39. Using his footage, Price produced *Crawford Road*, an independent film that premiered for an

audience of 250 people and later acquired additional views on social media platforms. *Id.* ¶¶ 40–42. Several months later, "two NPS officers came to Price's [workplace] and issued him a [criminal citation]" for filming without a permit. *Id.* ¶ 43. After the district court dismissed the charge (at the NPS's request), Price brought a facial challenge to the constitutionality of section 100905 and its implementing regulations (collectively, "Permit Regime"). *Price v. Barr*, 514 F. Supp. 3d 171, 179–80 (D.D.C. 2021). Acting on cross-motions for judgment on the pleadings, the district court ruled that the Permit Regime violates the First Amendment. *Id.* at 181.

## II.

To evaluate a facial challenge like Price's, we must first determine whether the regulated activity is "speech" protected by the First Amendment. *Boardley*, 615 F.3d at 514 (internal quotation marks omitted). If so, we "identify the nature of the forum, because the extent to which the [g]overnment may limit access depends on whether the forum is public or nonpublic." *Id.* (internal quotation marks omitted). Finally, we "assess whether the government's justifications for restricting speech in the relevant forum satisfy the requisite standard." *Id.* (internal quotation marks omitted). As relevant here, restrictions on speech in traditional public forums like the National Mall and designated public forums like "'free speech areas'" within the national parks must, at minimum, be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternatives for communication." *Id.* at 515–16 (describing the standard of scrutiny applicable to "[c]ontent-neutral restrictions on the time, place, or manner of speech in a public forum").

In this case, how we proceed at each step of our analysis is controlled by *Boardley v. United States Department of Interior*, in which our court held facially unconstitutional NPS regulations making it "unlawful to engage in expressive activities within any . . . national parks unless a park official first issue[d] a permit." *Id.* at 511. At the outset, we observed that requiring a permit for "public expressions of views" unquestionably regulated "'speech' within the meaning of the First Amendment." *Id.* at 512, 514. We then explained that the NPS regulations applied in "all . . . locations within the national parks," including the "'free speech areas' . . . and other public forums within [the] . . . parks." *Id.* at 515, 525. "[W]ithout deciding the forum status of every part of every national park," *id.* at 521, we analyzed the NPS regulations as restrictions on speech in public forums, asking whether the permit requirement was narrowly tailored to achieve the government's substantial interests in protecting national park resources and facilities from damage, minimizing interference with park activities, and preserving peace and tranquility within the parks. *Id.* at 519–24. We concluded that the regulations were not narrowly tailored because they required permits for large groups, small groups, and individuals even though requiring permits for "individuals and small groups promote[d] the government's [interests] only marginally." *Id.* at 522; *see id.* at 524 ("Because the means chosen are . . . substantially broader than necessary to achieve the government's interest[s], the NPS regulations are overbroad and not narrowly tailored." (internal quotation marks and citation omitted)).

Like the expressive activities at issue in *Boardley*, the "commercial filming activities" regulated by the Permit Regime constitute speech. Although the government argued in the district court that filming receives no First Amendment protection, it wisely dropped that argument on appeal because "[t]he act of *making* an . . . audiovisual recording is necessarily

included within the First Amendment's guarantee of speech . . . as a corollary of the right to disseminate the resulting recording." *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012). Indeed, the longstanding right to "expression by means of [audiovisual recording]," *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952), would have little meaning if "the act of creating that material" were unprotected. *Fields v. City of Philadelphia*, 862 F.3d 353, 358 (3d Cir. 2017); *see Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018) (To claim that "the act of creating an audiovisual recording is not speech protected by the First Amendment . . . is akin to saying that even though a book is protected by the First Amendment, the process of writing the book is not.").

Moreover, like the permit requirement in *Boardley*, the Permit Regime at issue here targets speech in public forums. As the government concedes, the Permit Regime applies to all NPS lands, including both "areas that [undoubtedly] meet the definition of traditional public forums" as well as "'free speech areas'" that constitute "'designated public forums.'" *Boardley*, 615 F.3d at 515; *see* Appellant's Br. 41 (Permit Regime "appl[ies] on *all* NPS lands, including . . . areas that constitute public forums."); *see also* 54 U.S.C. § 100501 (Permit Regime applies to "any area of land and water administered by the Secretary [of the Interior], acting through the Director [of the NPS], for park, monument, historic, parkway, recreational, or other purposes."). Because "[t]hese areas are subject to the same permit [and fee] requirement[s] as all other locations within the national parks," they "must be analyzed as restrictions on speech in public forums, and we need not . . . decide whether the same analysis would apply to the diverse range of other areas within the national parks." *Boardley*, 615 F.3d at 515–16.

The government argues that because many national parks include nonpublic forums, we must employ the lower standard of scrutiny applicable to content-neutral restrictions on speech outside public forums. In *Boardley*, however, we rejected this precise argument. We recognized that "many national parks include areas—even large areas, such as a vast wilderness preserve—which never have been dedicated to free expression and public assembly, would be clearly incompatible with such use, and would therefore be classified as nonpublic forums." *Id.* at 515. We also observed that, as in this case, the record lacked evidentiary submissions to "determine the forum status of the hundreds of national parks governed by the NPS regulations." *Id.* Nevertheless, because the national parks' public forums "[were] subject to the same permit requirement as all other locations within the . . . parks," we analyzed the NPS regulations as restrictions on speech in public forums "without deciding the forum status of all 391 national parks." *Id.*

The government makes much of the fact that Price's "own filming activity . . . occur[red] outside of any public forum." Appellant's Br. 59. But the location of Price's filming activity is irrelevant because, as the Supreme Court has made clear, "in the area of freedom of expression[,] an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992).

At *Boardley*'s third step, we assess whether the NPS's justifications for restricting speech in public forums satisfy the requisite standard of scrutiny. *Boardley*, 615 F.3d at 514. The government contends that the Permit Regime is content-neutral and, as such, need only be "'narrowly tailored to serve a significant governmental interest' and 'leave open ample

alternatives for communication.'" Appellant's Br. 42 (quoting *Boardley*, 615 F.3d at 516). But even if the Permit Regime is content-neutral, it still fails to withstand scrutiny under *Boardley*'s precise reasoning.

Like the NPS regulations in that case, the Permit Regime burdens substantially more speech than necessary to achieve the government's significant interests in protecting NPS resources and preventing interference with park visitors. *See Boardley*, 615 F.3d at 519 (finding significant governmental interests in protecting the national parks' natural and cultural resources, protecting visitors, and avoiding interference with park activities). Because "commercial filming" includes any videography intended to "generat[e] income," 43 C.F.R. § 5.12, the Permit Regime applies to an extraordinarily broad group of people, ranging from large-scale filming operations, to small documentary film crews, to individuals who take short videos on their phones and later monetize this content on social media platforms. Even a park visitor who takes a five-minute video on her phone, planning to post it on YouTube and generate advertising revenue, must obtain a permit and pay a fee. Although large commercial filming projects may well "involve equipment operators, filming subjects, and sustained operations" that burden park resources and disturb visitors, Appellant's Br. 52, the government provides no reason to think that individuals and small groups "interfere meaningfully with [these] interests," *Boardley*, 615 F.3d at 521 (internal quotation marks omitted); *see id.* at 522 ("[T]he government has failed to show that *most* individuals and small groups . . . pose such problems."). "No doubt *some* individuals and small groups will cause these problems, but many will not; and the government has not explained why those [with the intent to generate income] are more likely to be problematic" than visitors who capture videos for personal use. *Id.* at 522. Thus, like the regulations in *Boardley* that "applie[d] not only to large groups,

but also to small groups and even lone individuals," the Permit Regime "target[s] much more [speech] than necessary" to advance the government's asserted interests in protecting NPS resources and park visitors. *Id.* at 520, 523.

The government argues that the Permit Regime, in addition to protecting NPS resources and park visitors from interference by filmmakers, advances a second significant governmental interest: "raising money." Appellant's Br. 42. But this interest is a nonstarter because the government may not "impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943). Although the government may impose licensing fees to "defray the expenses of policing" activities guaranteed by the First Amendment, any such fees may not exceed the amount needed to cover administrative costs. *Id.* at 113–14; *see Cox v. State of New Hampshire*, 312 U.S. 569, 577 (1941) (permitting "the charge of a fee limited to" covering administrative costs). As the statute itself and the implementing regulations make clear, the Permit Regime's fee is "in addition" to "any costs incurred as a result of filming activities or similar projects, including administrative and personnel costs." 54 U.S.C. § 100905(b); *see* 43 C.F.R. § 5.8 ("[T]he location fee is in addition to any cost recovery."). Thus, even were we to accept the government's characterization of the Permit Regime as simply a means to generate revenue from filmmakers, it would still amount to an unconstitutional "tax" on "activities guaranteed by the First Amendment." *Murdock*, 319 U.S. at 113.

The government insists that the Permit Regime's fee does not impose a tax on constitutionally protected speech because it is part of a broader suite of NPS permit and fee requirements that "tax[] businesses generally." Appellant's Br. 45 (internal quotation marks omitted); *see* Majority Op. at 20 (noting that

the government "charges a fee for all types of commercial activity on land controlled by the NPS"). But the challenged Permit Regime applies only to "commercial filming activities or similar projects." 54 U.S.C. § 100905(a)(1). It is thus irrelevant that other statutes and regulations not implicated in this lawsuit apply to "commercial activity, in general." Appellant's Br. 45.

Next, the government argues that it may tax commercial filming in its "proprietary capacity," citing the Eleventh Circuit's statement in *Atlanta Journal and Constitution v. Atlanta Department of Aviation* that "'when the [government] acts as a proprietor, reasonable regulations may include profit-conscious fees for access for expressive conduct.'" Appellant's Br. 48 (first quote); *id.* at 47 (second quote) (quoting *Atlanta Journal*, 322 F.3d 1298, 1309 (11th Cir. 2003)); *see* Majority Op. at 20–21. But as the Eleventh Circuit made clear, that rule applies only to fees charged for "distribution space in a *non-public* forum." *Atlanta Journal*, 322 F.3d at 1312 (emphasis added). The Permit Regime levies fees in *public* forums. And unlike the rental fees at issue in the government's cited cases, the Permit Regime's fee applies to individuals who neither reserve "fixed locations" on government property nor use such locations "to sell, exhibit or distribute materials." *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 643 (1981) (internal quotation marks omitted); *see Jacobsen v. City of Rapid City*, 128 F.3d 660, 664 n.2 (8th Cir. 1997) (explaining that the government may charge "rent . . . as landlord" when a "newspaper leases public property for commercial use"). Accordingly, the government's desire to tax commercial filming does not qualify as a "significant governmental interest." *Boardley*, 615 F.3d at 516.

Because the Permit Regime's restrictions on speech in public forums are not narrowly tailored to serve a significant

governmental interest, they cannot withstand constitutional scrutiny.

## III.

My colleagues opt to forego any application of heightened scrutiny to the government's speech restrictions and instead uphold the Permit Regime under a "'reasonableness' standard." Majority Op. at 17–18. Specifically, they hold that filming is not the "type of activity" to which forum analysis applies and, thus, filming in public forums "is subject to the same 'reasonableness' standard that applies to restrictions on [F]irst [A]mendment activity in . . . nonpublic forum[s]." Majority Op. at 18 ("For [filming], these areas are effectively nonpublic forums.").

The application of forum analysis to expressive pursuits, however, is not reserved for particular types of First Amendment expression. Far from parsing different treatment for different types of expression, the Supreme Court focuses on "the character of the *property* at issue," applying public forum doctrine to "*property* which . . . by tradition or designation [is] a forum for public communication" or "expressive activity." *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44–46 (1983) (emphasis added). Put another way, public forums are defined by "the objective characteristics of the property" or the designation of "propert[y] for expressive use." *Arkansas Education Television Commission v. Forbes*, 523 U.S. 666, 677–78 (1998); *see Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 814 (1984) (analyzing the "'character of the property at issue'"). If the property at issue qualifies as a public forum, it remains so regardless of which particular type of First Amendment expression occurs within the forum. *See John K. MacIver Institute for Public Policy, Inc. v. Evers*, 994

F.3d 602, 611 (7th Cir. 2021) (explaining that forum analysis encompasses "various expressive pursuits").

True, as my colleagues observe, "earlier [Supreme Court] cases" describe public forums as "natural and proper places" for "assembly," "discussion of public questions," and "dissemination of information." Majority Op. at 11–13 (internal quotation marks omitted). But this very same case law emphasizes the broad scope of protection afforded to speech in public forums, shielding against the abridgment of "the exercise of [one's] liberty of expression in [such] places," not merely the abridgement of certain types of expression. *Schneider v. New Jersey, Town of Irvington*, 308 U.S. 147, 163 (1939); *see also Perry*, 460 U.S. at 45 ("[T]he rights of the state to limit *expressive activity* [in traditional public forums] are sharply circumscribed." (emphasis added)). Professor Harry Kalven Jr.'s conception of public forums as First Amendment "easement[s]" reinforces this point. *See* Majority Op. at 14. The venerable right protected by this "easement" is not merely the right to communicate in public forums. It is the right "*to use* the streets and parks *for communication*," which a filmmaker does, regardless of where he later displays the film. *Hague v. Committee for Industrial Organization*, 307 U.S. 496, 515–16 (1939) (emphasis added). My colleagues reimagine the public forum to protect the stumping politician but not the silent photographer, to shield the shouting protester but not the note-taking reporter. These distinctions find no basis in First Amendment jurisprudence. It makes no more sense to exclude certain types of speech from public forums than it does to police which squirrels may enter a conservation easement.

More recently, several of our sister circuits have reiterated that forum analysis applies to all First Amendment expression, including filming. For example, the Seventh Circuit explained that forum analysis "addresses who has the right of access to

government property" to engage in "expressive pursuits— whether that expressive pursuit is leafletting teachers, soliciting charitable donations, wearing political buttons at a polling place, or *gathering information* for news dissemination." *Evers*, 994 F.3d at 611–12 (emphasis added). The First, Fifth, and Eighth Circuits, moreover, have applied forum analysis to filming just as they would to any other form of speech. *See Ness v. City of Bloomington*, 11 F.4th 914, 923 (8th Cir. 2021) (applying "the level of scrutiny applicable" to "traditional public fora" because the filming activities occurred in a "public park"); *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011) (explaining that the government's right to restrict filming was "'sharply circumscribed'" because the filming occurred in "the oldest city park in the United States and the apotheosis of a public forum"); *Turner v. Lieutenant Driver*, 848 F.3d 678, 690 (5th Cir. 2017) (explaining that filming from a public sidewalk is "'subject to reasonable time, place, and manner restrictions'" that must be "'narrowly tailored to serve a significant governmental interest'").

Although some of these cases arose in the context of recording public officials, Majority Op. at 15, the principles they state are much broader, describing "the First Amendment's protection of the broader right to film" in public places. *Turner*, 848 F.3d at 689; *see id.* at 690 ("Like all speech, filming the police 'may be subject to reasonable time, place, and manner restrictions.'"); *Wasden*, 878 F.3d at 1203–04 (citing cases involving the filming of police officers as examples of the "'First Amendment right to film matters of public interest'"); *Western Watersheds Project v. Michael*, 869 F.3d 1189, 1196 (10th Cir. 2017) ("An individual who photographs animals . . . is creating speech in the same manner as an individual who records a police encounter."). Yet the court cites not a single case that applies a "reasonableness" standard of scrutiny to a government restriction on filming in

public places. By stripping filming of the protections afforded to expression in public forums, the court puts us in direct conflict with other circuits and leaves important expressive activities unprotected in places where the First Amendment's guarantee of free speech should be at its apex.

## IV.

Under today's sweeping holding, regulation of filming on government property is no longer subject to heightened scrutiny, even when the filming occurs in traditional public forums where "the rights of the [government] to limit expressive activity are sharply circumscribed" or designated public forums that the government "has opened for use by the public as a place for expressive activity." *Perry*, 460 U.S. at 45; *see* Majority Op. at 2. Before standing outside Yosemite National Park's visitor center using a cell phone to record commentary on our national parks that will air on an advertisement-supported YouTube channel, an individual must obtain a permit and pay a fee. Before filming a protest on the National Mall, tourists must obtain a permit and pay a fee if they have any inkling that they might later make money from this footage on social media. And when the filming is spontaneous, these individuals will be criminally liable and face up to six months in prison even though they could not possibly have obtained a permit ahead of time. *See* 18 U.S.C. § 1865; 36 C.F.R. §§ 1.3, 5.5(a). By stripping public forum protection from filming, my colleagues—for the very first time—disaggregate speech creation and dissemination, thus degrading First Amendment protection for filming, photography, and other activities essential to free expression in today's world. *See Wasden*, 878 F.3d at 1203 (disaggregating video creation from dissemination "defies common sense"); *Fields*, 862 F.3d at 358 (similar); *Alvarez*, 679 F.3d at 595–96 (similar). I respectfully dissent.